## STRAUSS v. COMMISSIONER OF INTERNAL REVENUE.

## COMMISSIONER OF INTERNAL REVENUE v. STRAUSS.

### No. 226, Docket 20866.

Circuit Court of Appeals, Second Circuit.

June 4, 1948.

Cravath, Swaine & Moore, of New York City (Roswell Magill, Donald C. Swatland, George G. Tyler, and Leonard E. Kust, all of New York City, of counsel), for petitioner-respondent, Lewis L. Strauss.

Theron Lamar Caudle, Asst. Atty. Gen., and Sewall Key, Lee A. Jackson, and Helen Goodner, Sp. Assts. to the Atty. Gen., for Commissioner of Internal Revenue, respondent.

Before AUGUSTUS N. HAND, CHASE and FRANK, Circuit Judges.

CHASE, Circuit Judge.

These two petitions, which were consolidated for hearing, raise questions as to the taxpayer's liability for income taxes for the calendar years 1938 and 1939. Each party

442

prevailed upon one issue in the Tax Court and each filed a petition to review the decision adverse to him. As the issues are independent of each other they will be considered separately herein.

## The Kodachrome Issue.

■ The inventors of a process known as "Kodachrome," which is used in the manufacture of colored film, became entitled under a licensing agreement to receive royalties from the Eastman Kodak Company. On November 1, 1930, they assigned those royalties, except certain so-called flat royalties which may now be disregarded, to Kuhn, Loeb & Company as trustee to collect and pay them to those having the right to receive them.

The taxpayer was, on December 20, 1935, one of those who had a right to receive a certain percentage of such royalties from the trustee. He had acquired that right by performing certain personal services in connection with the financing of the Kodachrome process. On December 20, 1935, the petitioner assigned all his "right, title and interest in Kodachrome, manufactured by the Eastman Kodak Company," to his wife and the trustee was duly advised that he had done so. During 1938, the trustee paid $10,209.50 to the taxpayer's wife and during 1939 $14,183.94 which would, but for the assignment to her, have been paid to the taxpayer as his share of the royalties. The wife reported such payments in the respective years they were received and paid income taxes thereon. The commissioner, holding that the assignment was of future payments to the taxpayer for personal services performed by him, included them in his gross income for the proper years and determined deficiencies accordingly. The taxpayer then petitioned the Tax Court to redetermine the deficiencies, alleging, among other things, that in 1935 he was "the owner of an interest in the Kodachrome process of manufacturing color film." This was admitted in the respondent's answer and the Tax Court, three judges dissenting, expunged both deficiencies on the ground that the taxpayer had assigned property to his wife who received the payments from the trustee as income from that property and not as the assigned

earnings of the taxpayer from his previously rendered personal services. This issue is reviewable as one of law, since it turns upon the proper construction of § 22(a) of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, 22(a), in the light of undisputed facts. Cf. Trust of Bingham v. Commissioner, 325 U.S. 365, 65 S.Ct. 1232, 89 L.Ed. 1670, 163 A.L.R. 1175.

It is of little significance that the taxpayer in his petition in the Tax Court chose to call his right to receive part of the royalties paid by the Eastman Kodak Company "an interest in the Kodachrome process" and the Commissioner accepted that definition of it in his answer. It now appears that the "interest" was only the right to receive a percentage of the royalties. And the tax consequences of the assignment of that right are, needless to say, dependent upon the real nature of what was assigned, not upon the label attached to it by the parties.

■ It has been well settled since Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731, that compensation derived from personal services is taxable to the one who performs the service whether or not he actually receives the compensation or transfers the right to receive it before it is earned. Burnet v. Leininger, 285 U.S. 136, 52 S.Ct. 345, 76 L.Ed. 665; Commissioner of Internal Revenue v. Tower, 327 U.S. 280, 66 S.Ct. 532, 537, 90 L.Ed. 670, 164 A.L.R. 1135. In Helvering v. Eubank, 311 U.S. 122, 61 S.Ct. 149, 85 L.Ed. 81, the principle was extended to cover the assignments of compensation due in the future for personal services performed in the past. We think the last mentioned case controlling in this instance. These payments were the result of personal services performed in the past by the taxpayer. The taxpayer did not receive for those services any part of the Kodachrome process itself or any right to control the disposition of that process. Rather, he obtained the enforceable promise of the owners of the process that he would be paid for his services a definite portion of the royalties they had the right to receive from the Eastman Kodak Company. That is to say, his "interest in the process" was never greater than a contract right to be

paid certain ascertainable sums of money. From first to last his pay for his services was to be only in money determinable in amount by reference to a royalty agreement covering the process. This taxpayer's right to receive royalties, we think, is indistinguishable from the right, which was considered in Helvering v. Eubank, supra, to receive part of past earned commissions on future premiums on insurance contracts. There also the assignment was of the taxpayer's right, title, and interest in the contract as well as the renewal commissions. As was said in Commissioner of Internal Revenue v. Tower, supra, "A person may be taxed on profits earned from property, where he neither owns nor controls it. Lucas v. Earl, supra. The issue is who earned the income * * *" 327 U.S. at page 289, 66 S.Ct. at page, 90 L.Ed. 670, 164 A.L.R. 1135. The decision on the Kodachrome issue is reversed with directions to reinstate the deficiency for each year.

### The Polaroid Issue.

The taxpayer agreed in 1937, before Polaroid Corporation was organized, to purchase 450 shares of its 5% Cumulative Class A stock at its par value of $100 a share in consideration of its issuance to him together with 1,350 shares of the common stock of that corporation, par value $1, which he was to receive as a bonus. He performed this agreement in accordance with its terms by taking 225 shares of the Class A stock, for which he paid $22,500, on or about September 24, 1937 and the remaining 225 shares, for which he paid the same amount, in 1939. When he purchased the first shares in 1937, according to the agreement, 1,350 shares of common were issued to him as a bonus. So far as appears the only disposition he ever made of any of these shares was to sell 500 of the common during October and November, 1938 for an aggregate net price of $23,461.65. He accounted for the proceeds of these sales in his 1938 return of income as a short term capital gain of $16,361.65, having deducted $7,100 from his net receipts as the cost of the stock to him. The Commissioner considered that the stock had a cost basis of zero and determined a deficiency based upon the inclusion of the total net sale price

in the taxpayer's gross income. On review in the Tax Court the Commissioner attempted to maintain that position while the taxpayer sought a refund on the ground that no part of the sale price was taxable since it did not exceed the cost of all 450 shares of the Class A stock purchased. He claimed that apportionment of the cost between the two classes of stock was impracticable, this position being taken in reliance upon Art. 22(a)-8, of Treasury Regulations 101, which so far as is pertinent provides that: " * * * If common stock is received as a bonus with the purchase of preferred stock or bonds, the total purchase price shall be fairly apportioned between such common stock and the securities purchased for the purpose of determining the portion of the cost attributable to each class of stock or securities, but if that should be impracticable in any case no profit on any subsequent sale of any part of the stock or securities will be realized until out of the proceeds of the sales shall have been recovered the total cost."

The Tax Court found that apportionment was practicable and made it by finding that the relative per share value of the Class A stock and the common was four to one. The taxpayer insists that even if apportionment is practicable that made by the Tax Court is erroneous because all of the common shares were treated as received as a bonus with the purchase of the first 225 share block of Class A when in fact they were a bonus on the purchase of the entire 450 shares of Class A stock which the taxpayer was bound to take and did in fact purchase.

█ It is clear, of course, that apportionment is practicable, and consequently right, when made between two classes of stock each of which has an ascertainable fair market value. Houghton v. Commissioner, 2 Cir., 71 F.2d 656, cert. denied 293 U.S. 608, 55 S.Ct. 124, 79 L.Ed. 699; see Taylor v. Commissioner, 2 Cir., 70 F.2d 619, affirmed, Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623. And the case last mentioned shows that it is enough to defeat an apportionment to show that the one made is wrong without proving what would be the correct one.

But here there was no ascertainable fair market value for either class of stock in 1937 when the taxpayer made his contract to purchase and when he acquired the first block of 225 shares of Class A. He argues that absent a definitely computable fair market value of at least one class of the stock there can be no apportionment.

It was here stipulated and found that the Polaroid Corporation, "was organized on September 13, 1937, with a capitalization of 7,500 shares of 5% Cumulative Class A stock of the par value of $100 per share, 2,500 shares of $5 Cumulative Class B stock of the par value of $5 per share and 100,000 shares of common stock of the par value of $1 per share, for the purpose of developing certain patents and patent applications relating to a process of light polarization, known as the 'Polaroid' process." All of Polaroid's Cumulative B stock and all of its common stock were exchanged on September 20, 1937 for patent rights and for stock of various companies, "which companies had been formed from time to time for research, manufacturing, patent-holding or other purposes." On the same day 71,500 shares of the common stock of Polaroid were put into a voting trust. This left 28,-500 common shares, of which 22,500 were delivered as a bonus to purchasers of the Class A stock, 5000 were sold in units with the Class B stock, and 1000 were retained by the persons to whom the common and B stock were originally issued.

The above mentioned block of 5,000 shares was divided into five units of 1,000 shares each, each unit being sold in September and October, 1937 together with 250 shares of Class B stock for $50,000 pursuant to the same agreement under which the taxpayer had acquired his Class A and common shares. This agreement further provided that upon a voluntary liquidation of the corporation the Class A stock should be preferred over the Class B and common stock as to dividends and redemption and that the Class B stock should be so preferred over the common. But upon an involuntary liquidation the net assets were to be distributed, share and share alike, among the holders of all the classes of stock. The Class A stock was, at the option of the corporation, redeemable in whole or in part, upon notice of at least three months, at its par value plus "all accrued and unpaid dividends thereon provided that a similar proportion of the outstanding Class B stock should be redeemed at the same time at the redemption price of $100 per share plus all accrued and unpaid dividends thereon." In addition it was provided that purchasers of Class A stock might during four years only, at their option, buy voting trust certificates covering 5,000 of the common shares at the following prices: if the delivery date were within the first year of the corporation's existence, $25 per share; if within the second year, $37.50 per share; if within the third year, $50 per share; and if within the fourth year, $100 per share. It was also agreed that if the purchasers should take up and pay for any part or all of the additional 3,750 shares of Class A stock, the price per share of the voting trust certificates would be reduced by $5 per share.

It was also stipulated and found that, "No class of stock of Polaroid was listed on any securities exchange in 1937. There were no quotations available on any class of the stock of Polaroid in the over-the-counter market in 1937." And it was found that, "With certain exceptions the common stock carried exclusive voting privileges."

The consolidated balance sheet of Polaroid and its subsidiaries as of December 31, 1937 showed current assets of $352,451.40 and total assets of $526,593.54 with liabilities of $11,512.64 and capital and surplus of $515,080.90. Of this, $487,500 was assigned to capital stock outstanding as follows: 3,750 shares of Class A at its par value of $100 per share, 2,500 shares of Class B at its par value of $5 per share, and 100,000 shares of common at its par value of $1 per share.

Having found the basic facts as above outlined, the Tax Court made its ultimate findings as follows: "The relative value per share of the common stock of Polaroid was one-fourth of the value per share of the Class A stock at the time of acquisition thereof by petitioner. An allocation of the cost per share of the total cost of $22,500 for 225 shares of Class A stock and 1350 shares of common stock between such two

classes of stock, in accordance with the above stated relative per share is practicable and reasonable."

In making this ultimate finding the Tax Court could and did, as the majority opinion shows, take into consideration the facts that "(a) The redemption value of both the Class A and the Class B stock was $100 per share; (b) The minimum option price of the common stock was $25 per share; (c) The sale price of the Class A stock was $100 per share; and (d) The sale price of a unit of 250 shares of B stock and 1000 shares of common stock was $50,000." And it considered that, "The common stock, the sale of which is here involved, was part of a common stock bonus in the sale of 225 shares of A· stock at $100 per share. The sale price of the 100 shares of common stock sold in a unit with 250 shares of B stock for $50,000 was obviously not less than $25 per share since the 250 shares of B stock in each unit was redeemable at $100 per share. Hence the portion of the $50,000 unit sale price allocable to the 1000 shares of common stock in such unit was not less than $25,000."

■ This finding of relative value may not have been reached upon a mathematical computation based upon findings of actual market value in dollars and cents of the two kinds of stock at the time the taxpayer acquired them in 1937. That might be one way to determine relative value and where the market price for each class of stock is ascertainable, might well be the chosen way. Of course, the absence of evidence that a market existed which would establish a fair market value for either class of stock made valuation more difficult. Nevertheless, we cannot say as a matter of law that apportionment was thus made impracticable. Houghton v. Commissioner, supra. Whether or not it is impracticable in any given case, is peculiarly a question for the Tax Court. See 3 Mertens, Law of Federal Income Taxation, § 21.24 p. 382; Salvage v. Commissioner, 2 Cir., 76 F.2d 112, affirmed

Helvering v. Salvage, 297 U.S. 106, 56 S.Ct. 375, 80 L.Ed. 511. The requirement of the regulation is only that the cost be fairly apportioned. Here the taxpayer had himself made an apportionment of the cost of the A stock by attributing $7,100 or $14.50 per share to the common stock he sold in reporting for taxation his capital gain on the sale. The Commissioner had made an apportionment by allocating the entire purchase price to the Class A stock and attributing nothing to the common stock as its cost basis. The Tax Court, having duly found and considered the relevant facts, endorsed neither what the taxpaper nor the Commissioner had done but independently arrived at its own conclusion based upon findings which have substantial evidential support.

■ Indeed, the taxpayer does not argue that, assuming apportionment to be practicable, the tax court's apportionment was erroneous, except to say that the relative values should have been based upon the purchase of the entire 450 Class A shares which the taxpayer ultimately acquired, on the theory that he was bound to take them all. He was, however, bound to take the second block of 225 shares only if the corporation so elected. He was entitled to the bonus shares upon his purchase of the first 225 Class A shares in 1937 and they were his when he received them to do with as he pleased. He sold the 500 shares before he took up any additional A shares and in 1939 when he did buy the remaining A shares he was entitled to an additional bonus in the form of a $5 per share reduction in the option price of the voting trust certificates covering 5,000 of the common shares. In this situation we cannot say as a matter of law that the Tax Court was bound to treat the two purchases of Class A stock as a unit instead of separately, at least for purposes of apportioning the purchase price. On this issue the decision is affirmed.

Decision affirmed in part, reversed in part.