IRA HIRSCH AND GLORIA HIRSCH, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1287–66. Filed October 23, 1968.

*Joseph Rabin,* for the petitioner.
*James A. Thomas,* for the respondent.

FORRESTER, *Judge:* Respondent has determined deficiencies in petitioners' income taxes for the years 1961 through 1963 in the following amounts:

| Taxpayer | Year | Deficiency |
|---|---|---|
| Ira Hirsch | 1961 | $4, 943. 02 |
| Gloria Hirsch | 1961 | 4, 799. 02 |
| Ira and Gloria Hirsch | 1962 | 4, 608. 66 |
| Ira and Gloria Hirsch | 1963 | 13, 570. 92 |

Concessions have been made by both parties. The only issues remaining are—

Whether the taxpayers received taxable income upon the exercise of certain stock options.

Whether a $33,000 payment made to Ira Hirsch constituted ordinary income or an amount received from the sale or exchange of a capital asset.

GENERAL

Some of the facts are stipulated and are so found.

The petitioners, Ira and Gloria Hirsch, are husband and wife, residing at the time the petition in the instant case was filed in Sherman Oaks, Calif. Petitioners filed separate returns for the calendar year 1961, and joint returns for the calendar years 1962 and 1963. All the returns were filed with the district director of internal revenue at Los Angeles, Calif.

Both of the issues in this case pertain to Ira Hirsch. Gloria is a petitioner solely because she is the recipient of community property and/or because she signed joint returns in 1962 and 1963. For convenience therefore reference to petitioner hereinafter refers to petitioner Ira Hirsch.

*Stock Option Issue*

During the years in issue and for a number of years prior thereto, Ira was vice president and sales manager of Pacific Vitamin Corp. (hereinafter sometimes referred to as Pacific). Since October 1964 he has been president and chairman of the board of directors of Pacific.

On March 1, 1961, Ira and Pacific executed an employment agreement covering the period January 1, 1961, through December 31, 1962.

The agreement *inter alia* called for Ira to receive a salary of $350 per week for the first 4 weeks, and $325 per week thereafter. If net income of the company for any two consecutive quarters fell below $12,000 in each quarter, the company had the right to terminate the employment agreement. It could also terminate the agreement if Ira was absent for 60 consecutive days due to disability or illness.

As additional compensation to Ira, the company obligated itself to the following alternatives:

(1) If on or before April 30, 1963, Pacific stock was issued to the public, Ira would receive an option, exercisable within 1 year, to purchase $26,250 worth of the stock for $1,250. (2) If Ira were still employed on December 31, 1962, and had "faithfully performed under the agreement," he was to receive an option on January 1, 1963, exercisable within 18 months to purchase an additional $26,250 worth of Pacific stock for $1,250.

Ira was limited to a total of 25,000 shares under the above two provisions. In addition, Ira was required to execute whatever agreements limiting his rights to dispose or encumber the stock as might be executed by David Vickter (hereinafter sometimes referred to as Vickter), the president and sole shareholder of Pacific at the time the employment agreement was entered into.

If the corporation, on or before April 30, 1963, were to sell all of its assets or if Vickter were to sell all of the issued and outstanding stock and Ira had faithfully performed under the agreement, he was to receive $50,000 and any obligation the company had to employ him or pay him a weekly salary would terminate. In the event that David Vickter sold more than 50 percent of his interest, but less than 100 percent, Ira was to receive only a portion of the $50,000. If none of the designated contingencies took place, Ira was to be entitled to a reasonable bonus to be subsequently determined.

The full agreement reads as follows:

### PACIFIC VITAMIN CORPORATION

1649 South La Cienega Boulevard
Los Angeles 35, California

MARCH 1, 1961

MR. IRA HIRSCH
*c/o Jack Tenner*
*6535 Wilshire Boulevard*
*Los Angeles 48, California*

DEAR IRA:

We should like to take the opportunity at this time to set forth in writing our agreement with respect to your employment by us during the period from January 1, 1961, through December 31, 1962.

1. We hereby agree to employ you for a two-year term beginning January 1, 1961, and ending December 31, 1962. During the first four weeks of said term, your compensation will be Three Hundred Fifty Dollars ($350.00) per week, and during the remaining one hundred (100) weeks of said term, your salary shall be Three Hundred Twenty-five Dollars ($325.00) per week. In consideration for the payment of this salary to you, you agree to render your services to us in an executive capacity on an exclusive basis and to perform such functions as we may direct you to perform in connection with our business.

2. Notwithstanding the provisions set forth in Paragraph 1 hereof, we shall have the right to terminate your employment within forty-five (45) days after the close of any two consecutive calendar quarters in each of which our net income (before income taxes but after deducting all other expenses, including salaries) is less than Twelve Thousand Dollars ($12,000.00). A calendar quarter for this purpose shall be deemed the three-month periods ending on March 31st, June 30th, September 30th and December 31st, respectively, during the calendar years 1961 and 1962.

In the event that we terminate your employment pursuant to the provisions of this Paragraph 2, you shall be entitled to receive your weekly salary up to the date on which your employment is terminated.

3. As additional compensation to you, we further agree to pay to you the following, depending upon which of the alternatives set forth below occurs:

(a) If on or before April 30, 1963, our stock is issued to the public, you shall receive the following options:

(i) An option exercisable on or within one (1) year after the date on which stock is offered to the public to purchase from us for the sum of One Thousand Two Hundred Fifty Dollars ($1,250.00), sufficient shares of our stock, which when multiplied by the original per share issue price to the public shall equal the

sum of Twenty-six Thousand Two Hundred Fifty Dollars ($26,250.00). For example, if our stock is issued to the public on June 15, 1961, at a per share price of Ten Dollars ($10.00), then you shall be entitled to purchase from us for the sum of One Thousand Two Hundred Fifty Dollars ($1,250.00), a total of two thousand six hundred twenty-five (2,625) shares of common stock.

(ii) Provided that you have faithfully performed under this agreement and are still employed by us on December 31, 1962, an option exercisable on January 1, 1963, or within eighteen (18) months thereafter to purchase from us for the sum of One Thousand Two Hundred Fifty Dollars ($1,250.00) sufficient shares of our stock, which when multiplied by the original per share issue price to the public shall equal the sum of Twenty-six Thousand Two Hundred Fifty Dollars ($26,250.00). In the event of your death prior to December 31, 1962, but at a time when you shall still be employed hereunder, your successors in interest shall be entitled to exercise that portion of the option granted to you under this Paragraph 3(a)(ii), which the number of days between January 1, 1961, and the date of your death bears to the number of days between January 1, 1961, and December 31, 1962. For example, if our stock is issued to the public on June 15, 1961, at a per share price of Ten Dollars ($10.00), and is selling for a different per share price on the date you exercise your option, then you shall, nevertheless, be entitled to purchase from us for the sum of One Thousand Two Hundred Fifty Dollars ($1,250.00), a total of two thousand six hundred twenty-five (2,625) shares of common stock, regardless of whether you have exercised the option granted to you under Paragraph 3(a)(i) hereof.

(iii) It is understood that in the event of a public issue, you will execute whatever agreements limiting your right to dispose of or encumber our stock as may be executed by Mr. David Vickter.

(iv) Notwithstanding anything herein to the contrary the options granted hereby shall not in any case entitle you to purchase more than 25,000 shares of our stock.

(b) If on or before April 30, 1963, we shall sell all of our assets to a purchaser, or if David Vickter, the present owner of all of our issued and outstanding stock, shall sell all of our issued and outstanding stock, and if you shall have faithfully complied with the terms hereof up to the date of such sale, then, upon the date upon which such sale is concluded, we shall pay you the sum of Fifty Thousand Dollars ($50,000.00) as additional compensation. After making such payment of Fifty Thousand Dollars ($50,000.00) to you, our obligation to employ you shall terminate, and we shall no longer be required to pay you a weekly salary.

In the event that David Vickter, the present owner of all of our issued and outstanding stock, shall sell more than fifty per cent (50%) of his interest in the corporation, then we shall pay you an amount equal to that proportion of Fifty Thousand Dollars ($50,000.00) which the number of shares of stock sold by David Vickter bears to all of our issued and outstanding shares at the time of such sale. Such payment shall be credited against our total obligation to pay you Fifty Thousand Dollars ($50,000.00) upon the sale of all of our assets or upon the sale by David Vickter of all of our issued and outstanding stock owned by him.

(c) If neither of the contingencies described in subparagraphs (a) and (b) of this Paragraph 3 occurs prior to December 31, 1962, and if you shall have faithfully complied with the provisions of this agreement for its entire term, then we shall pay you a reasonable bonus in an amount to be mutually determined between us.

4. You shall be entitled to two (2) weeks' vacation with pay each calendar year during the term hereof at such times as shall be mutually agreed upon between us.

5. In the event of your failure to perform services hereunder for a consecutive period of sixty (60) days as a result of your illness or disability, we shall have the right to terminate this agreement. In the event of your death, during the term hereof, we shall also have the right to terminate this agreement as of the date of your death.

6. During the term of your employment you shall be entitled to be reimbursed for all out-of-pocket expenses incurred by you on our behalf.

7. We have been informed by our counsel that since this agreement contemplates the possible issuance to you of shares of our stock, we must obtain a permit from the Corporation Commissioner of the State of California in order to enter into this agreement. Each of us agrees to cooperate in preparing, executing, and filing whatever documents may be necessary in order to secure such a permit.

8. It is specifically agreed that we shall have the right to assign this agreement to any person, firm or corporation acquiring all of our assets.

We are submitting this letter to you in duplicate. If it correctly sets forth our understanding, please sign and return one copy to us, and retain one copy for your files.

Sincerely Yours,                      PACIFIC VITAMIN CORPORATION,
                                By          [Illegible]
Accepted and agreed to:
(Signed) IRA HIRSCH

On June 22, 1961, a public offering of 100,000 shares of Pacific Vitamin Corp. was made. The offering circular distributed by the underwriter, Norman C. Roberts Co., represented that the offer was made "Pursuant to an Exemption from Registration with the United States Securities and Exchange Commission."[1] It also stated that the company an its shareholders at the time of the offering had "agreed not to sell any shares of Common Stock for a period of six months after the initial public offering, without the consent of the Underwriter."

In accordance with the terms of subparagraph 3(a)(i) of the above agreement, Ira, by letter, exercised the first option, paid $1,250 and received 8,750 shares of Pacific.

The letter, dated July 3, 1961, represents that the stock was being purchased for investment, not for distribution to others. It states that Ira was aware of the fact that all other shareholders of Pacific had agreed with Norman C. Roberts Co., the underwriter of the offering described above, to refrain from selling any Pacific shares for 6 months after the initial issue of the shares, and that he agreed to be bound by the restriction.

In 1961 approximately four brokers made a market for Pacific stock on the over-the-counter market. On July 3, 1961, the brokerage firm of Robert Scott purchased 200 shares of Pacific stock at 4½ dollars, and on the same day the same firm purchased 200 shares of

---

[1] The exemption is commonly referred to as a regulation A exemption for small issues of stock.

Pacific at 3⅞ dollars. On July 26, 1961, stock of Pacific included in the public offering described above was traded over-the-counter at a bid price of 3¾ and an asked price of 4⅛.

The high bid and asked price for Pacific shares during 1961 was 7⅛ and 8½, respectively, and the low bid and asked price was 3¾ and 4⅛, respectively. The following bid and asked prices are representative over-the-counter prices for the designated months in 1961:

**1961**

| Month | Bid | Asked | Month | Bid | Asked |
|---|---|---|---|---|---|
| July | 3⅞ | 4¼ | October | 6½ | 7½ |
| August | 6¾ | 7⅛ | November | 6 | 7 |
| September | 5¾ | 6¾ | December | 5½ | 6½ |

Early in 1962 Ira considered terminating his association with Pacific and discussed this possibility with Vickter. Pursuant to these discussions, Ira requested that the law firm of Irell & Manella, attorneys for Pacific, write a letter to the SEC requesting that the SEC issue a ruling that no legal action would be taken against Ira in the event he sold some of his Pacific stock.

In response to such letter, the SEC replied that on the basis of the facts set forth in the letter they could not conclude that the shares in question could be sold without prior registration under the Federal Securities Act of 1933. It further stated that, if the shares were sold without prior registration under the 1933 Act, there would be a violation of section 5 of the Act and that such a sale could provide a basis for the suspension of the exemption under regulation A of the regulations promulgated thereunder.

The reply reads as follows:

SECURITIES AND EXCHANGE COMMISSION

Washington 25, D.C.

*February 1, 1962*

IRELL AND MANELLA
*9171 Wilshire Boulevard*
*Beverly Hills, California*
Attention: Ronald M. Loeb, Esquire
Re: Pacific Vitamin Corporation
GENTLEMEN:

This will refer to your letter of January 2, 1962 requesting a "no action" letter with respect to the proposed sale by Mr. Ira Hirsch of 8750 shares of common stock of the above captioned company (Pacific). You further request a ruling by the Commission that such sale will not affect the exemption under Regulation A which was relied upon by Pacific and a selling stockholder, Mr. David Vickter, in the public offering in June 1961 of an aggregate of 100,000 common shares of Pacific stock.

As more fully set forth in your letter, you state that Mr. Hirsch has been vice-president, sales manager and a director of Pacific for the past several years.

Under an employment agreement entered into on March 1, 1961 Pacific agreed to extend to Hirsch two stock options if Pacific should make a public offering of its shares prior to April 30, 1963. The first option, exercisable on or within one

year after the date of any public offering of Pacific stock, provided for the purchase for $1,250 of that number of shares which when multiplied by the offering price would equal in value the sum of $26,250. The second option, similar to the first, was exercible [sic] on June 1, 1963 or thereafter provided that Hirsch was employed by Pacific on December 31, 1962.

The sale to the public of 100,000 Pacific shares, as referred to above, comprised of 66,667 shares and 33,333 shares offered on behalf of the company and Vickter respectively at $3 per share was commenced on June 21, 1961.

On July 3, 1961 under the option provided for in his employment contract Hirsch purchased 8750 Pacific shares. These shares were issued by the company in reliance upon the exemption from registration provided by Section 4(1) of the Securities Act of 1933 and Hirsch represented at that time that the shares were acquired for investment and not with a view to distribution.

Due to certain disagreements in policy between Hirsch and the company it is now mutually agreed that termination of Hirsch's employment and his resignation as a director would be in the best interests of both Pacific and Hirsch. Hirsch then wishes to sell all or a portion of the 8750 shares so that he might invest in a new business which will be his source of livelihood.

On the basis of the facts set forth in your letter this Division is not prepared to conclude that sale of the shares in question may be made at this time without prior registration under the Securities Act of 1933. Further, if such shares were sold without registration at this time there would be a violation Section 5 of the Act and such sale could provide a basis for the suspension of the exemption under Regulation A relied upon by the company and Mr. Vickter in the public offering of Pacific shares.

Very truly yours,

(Signed)    Charles E. Shreve
CHARLES E. SHREVE by [Illegible]
*Chief Counsel,*
DIVISION OF CORPORATION FINANCE

On February 22, 1962, Irell & Manella advised Ira of the SEC reply, advising him, *inter alia,* "the Commission seems indisposed to approve such a sale where the stock has been purchased within two years."

Prior to the receipt of the letter of February 1, 1962, from SEC, Irell & Manella had sent the following letter, requesting that shares of Pacific held by certain named individuals, including Ira, not be transferred:

LAW OFFICES
IRELL & MANELLA
9171 Wilshire Boulevard
Beverly Hills, California

*January 16, 1962*

MISS RUBY MOORE
*City National Bank*
*Beverly Hills, California*

Re: *Pacific Vitamin Corp.*

DEAR MISS MOORE:

Pursuant to our telephone conversation of this afternoon, on behalf of Pacific Vitamin Corp., we are hereby requesting that no transfers of stock held by the

individuals named below be made by you. This letter shall constitute a stop order prohibiting such transfers:

|  | Shares |
|---|---|
| Irell & Manella | 5,000 |
| Alexander Jablow | 8,333 |
| Florence Clare | 6,667 |
| Ira Hirsch | 8,750 |
| David Vickter | 318,333 |

If any of the aforementioned individuals has registered presently in his or her name a number of shares different from that set forth opposite his or her name above kindly notify the undersigned at once. This stop order shall apply to all shares registered in the names of those individuals and not merely to the amount set forth above.

Very truly yours,

(Signed) RONALD M. LOEB
for Irell & Manella

RML: mo

cc: Mr. David Vickter

Certified Mail
Return Receipt

On November 29, 1962, Vickter sold 212,925 of his Pacific shares (representing a 51-percent interest in the company) to Nutrilite Products, Inc. On January 1, 1963, Pacific entered into a new employment agreement with Ira for the benefit of Nutrilite. The agreement covered the period of January 1, 1963 to May 31, 1966, with a 2-year renewal provision. Included in the agreement was a restrictive covenant which prohibited Ira from selling any of his shares of Pacific then owned or to be owned pursuant to his remaining option for a period of 1 year from the date of the agreement. After that time, Ira could dispose of the stock under certain prescribed conditions. The relevant portion of the agreement is reproduced below:

*7. Restrictive Covenant*

HIRSCH is the owner of 8,750 shares of EMPLOYER's common stock and has an option to purchase an additional 8,750 shares of said common stock. Such shares which HIRSCH now owns or may hereafter own are hereinafter referred to as the "subject stock". As a condition of this Employment Agreement, HIRSCH agrees to retain an ownership interest in EMPLOYER under the terms and conditions set forth herein. HIRSCH agrees not to transfer, sell, assign, hypothecate or otherwise dispose of any of the subject stock for a period of one year from the date of this Agreement. During the five-year period commencing on a date one year after the date of this Agreement, HIRSCH agrees that he will not sell, transfer, assign, hypothecate or otherwise dispose of the subject stock except upon the following basis:

During said five-year period, before HIRSCH may sell, transfer, assign, hypothecate or otherwise dispose (herein collectively called "dispose") of any part of the subject stock, he shall first offer to dispose of such stock to NUTRILITE by giving written notice thereof, which notice shall include all of

the terms and conditions of such proposed disposition. Within thirty days after receipt of such notice, NUTRILITE shall have the right to accept such offer upon the terms and conditions specified in such notice. If within such thirty-day period NUTRILITE does not, by written notice deliver to HIRSCH, accept the offer, HIRSCH shall be free to dispose of such stock to any persons strictly in accordance with the terms of such offer, for a period of ninety days. If HIRSCH proposes to dispose of such stock upon any different terms, HIRSCH shall give a new notice to NUTRILITE and NUTRILITE shall have an opportunity to accept such new offer for a period of thirty days. Any stock purchased by any third person after compliance by HIRSCH with the foregoing provisions of this section 7 shall thereafter be free from the restrictive provisions of this section 7. HIRSCH shall furnish to NUTRILITE documentary proof of the disposition of any of the subject stock within thirty days after the date of such disposition.

The number of shares of stock which HIRSCH may dispose of during each year of the aforesaid five-year period shall be determined by multiplying the number of shares owned by HIRSCH at the commencement of the year by the applicable percentage listed below opposite the particular year:

| Year | Percentage |
|------|------------|
| 1963 | 20 |
| 1964 | 25 |
| 1965 | 33⅓ |
| 1966 | 50 |
| 1967 | 100 |

The number of shares owned by HISCH at the commencement of any year shall be deemed to be the number of shares owned by HIRSCH and any trust or family member as provided herein on the first day of each year (except that with respect to the year 1963, January 3, 1963, shall be the date upon which such determination shall be made).

Notwithstanding the foregoing provisions of this section, HIRSCH may make a gift of any shares owned by him at any time to his spouse, issue or other members of his immediate family, or to a trust for his or their benefit. The donee shall hold such shares subject to all of the provisions of this section 7 and shall not dispose of any shares except to other family members or such trusts without compliance with the provisions of this section.

For the purpose of carrying out the intention of this section 7, there shall be inscribed upon the certificate or certificates representing the subject stock, a statement of the restrictions contained in this section in such form as shall meet the approval of counsel for NUTRILITE and HIRSCH.

On May 31, 1963, Ira exercised the second option pursuant to the March 1, 1961, employment agreement and received an additional 8,750 shares of Pacific stock.

On July 27, 1965, Ira's attorney, Joseph Rabin, sent the SEC a letter requesting a ruling that the SEC would take no action adverse to Ira if Ira sold any or all of the Pacific shares he had received pursuant to his exercises of both his options.

On August 26, 1965, the SEC informed Rabin by the following letter that it could not conclude that an exemption was available for the proposed sale of the stock.

130

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

*August 26, 1965*

JOSEPH RABIN, Esquire
*Suite 801 Buckeye Building*
*8500 Wilshire Boulevard*
*Beverly Hills, California 90211*
    Re: Pacific Vitamin Corp.

DEAR MR. RABIN:

This will refer to your letter of July 27, 1965 concerning the proposed sale by your client Mr. Ira Hirsch of all or a portion of 17,500 shares of the common stock of Pacific Vitamin Corporation.

You state that Mr. Hirsch acquired 8,750 of such shares pursuant to the exercise of an option on July 3, 1961. A second block of 8,750 shares was acquired by him pursuant to the exercise of an option on May 31, 1963. Mr. Hirsch is the President of the Corporation and currently has no intention of terminating such employment.

You ask whether the sale by Mr. Hirsch of the stock acquired as described above would be exempt from the registration requirements of Section 5 of the Securities Act of 1933 under the exemption provided by Section 4(1) of the Act as a transaction by a person other than an issuer, underwriter, or dealer.

On the basis of the information submitted, we are unable to conclude that Mr. Hirsch is not a "control person" or a member of a "controlling group" with respect to Pacific Vitamin Corporation within the meaning of Section 2(11) of the Act. Accordingly, we are unable to conclude that the exemption in question is available for the proposed sales of stock.

        Very truly yours,

                    (Signed)   G. P. Michaely, Jr.
                            by [Illegible]
                    GEORGE P. MICHAELY, JR.
                    *Chief Counsel,*
                    *Division of Corporation Finance*

Had Ira attempted to sell his shares of Pacific at any time from the date of issue, he would have had quite a difficult time. Under his peculiar circumstances, there would have been few buyers willing to purchase his shares. Any buyer willing to purchase his shares, assuming that this could be done legally, would have demanded a discount of at least 15 to 20 percent from the quoted over-the-counter prices. Even if Ira could have registered his shares under regulation A of the Securities Act of 1937, it would have cost him a minimum of $3,000 to $6,000 to do so.

When petitioner exercised his option to purchase 8,750 Pacific shares in 1961, that company treated the issuance of such shares as additional compensation to Ira for tax purposes. The corporation determined that the fair market value of the stock at the date the option was exercised was $3 per share, and on its tax return for the year ended May 31, 1962, claimed a deduction of $25,000 as compensa-

tion to Ira. The $25,000 deduction represented the difference between the determined total fair market value of $26,250 and the option price of $1,250.

Petitioner did not report any income from the exercise of the option in any of the years in issue.

In his statutory notices of deficiency for the taxable year 1961 sent to Ira and Gloria individually, respondent determined that Ira had received $25,000 in taxable compensation on the exercise of the option. Dividing the $25,000 equally between Ira and Gloria in accordance with the California community property laws, he determined that each had realized $12,500 in income from the exercise of the options.

### ULTIMATE FINDING OF FACT

Ira's stock was, at all times during the years in issue, subject to a restriction or restrictions which had a significant effect on its value.

### Ordinary Income or Capital Asset Issue

When David Vickter sold a 51-percent interest in Pacific to Nutrilite Products, Inc., the agreement between Vickter and Nutrilite setting forth the terms of the sale, dated November 29, 1962, contained the following clause:

12. In the opinion of BUYER, the management services of SELLER and Ira Hirsch are an important part of the successful operation of PACIFIC and the continuation of such services for as long a period as may be justified by the satisfactory performance of their duties, is deemed essential by BUYER. Accordingly, SELLER agrees to enter into an Employment Agreement with PACIFIC substantially upon the terms and conditions of the Employment Agreement attached hereto as Exhibit "E," which is incorporated herein by this reference.

SELLER agrees that he will pay to Ira Hirsch at SELLER's own and sole expense, an amount which shall not exceed *Thirty-three thousand ($33,000.00)* Dollars, as determined between SELLER and Hirsch, to induce Hirsch to enter into an Employment Agreement with PACIFIC substantially upon the terms and conditions of the Employment Agreement attached hereto as Exhibit "F," which is incorporated herein by this reference.

On December 14, 1962, Ira and Vickter entered into the following agreement in which Ira, *inter alia*, agreed to accept $33,000 in satisfaction of all claims which he had against Vickter:

*December 14, 1962*

MR. IRA HIRSCH
*Los Angeles, California*

DEAR IRA:

This is to confirm our arrangement as follows:

1. Concurrently with your acceptance of the terms of this letter, I will deliver to you my note payable to your order upon demand after January 2, 1963, in the sum of $20,000.00.

2. On January 3, 1963, I will pay to you the additional sum of $13,000.00.

3. Concurrently with your receipt of the aforesaid $13,000.00 payment, you will pay $10,000.00 to Fidelity Bank in reduction of your existing loan from that Bank in the principal sum of $25,000.00.

4. Concurrently with the aforesaid payment to Fidelity Bank, I will guaranty payment to the Bank of the unpaid balance of the loan ($15,000.00) and use my best efforts to obtain for you necessary extensions so that you may repay the loan in installments in the manner hereafter specified. If Fidelity Bank will not so extend the loan, I will obtain a similar loan for you elsewhere.

5. You agree to repay the Fidelity Bank loan (or any other loan obtained for you by me) at the rate of $200.00 every two weeks commencing January 7, 1963. Such payments shall be made by you until the full amount of principal and interest is paid, out of your salary from Pacific Vitamin Corp. and you shall give an appropriate instruction to that firm to make such payments directly to the Bank.

6. Your Employment Agreement with Pacific Vitamin Corp., effective January 1, 1963, provides for basic compensation at the rate of $29,000.00 per year until May 31, 1966. If for any reason (including your death) you receive less than the sum of $2,416.66 from Pacific Vitamin Corp. for any month prior to June of 1966, I agree to pay to you or your representative upon demand the difference between $2,416.66 and the amount actually received by you or your representative from Pacific Vitamin Corp. (or any successor to that company), but in no event shall I be obligated to pay more than $416.66 for any one month. My obligation to make payments in accordance with the provisions of the preceding sentence shall cease with respect to any subsequent month in the event my employment by Pacific Vitamin Corp. as its chief executive employee is terminated without my consent, but said obligation shall continue notwithstanding my death or the voluntary termination of my said employment. You agree to use your best efforts to remain in the employ of Pacific Vitamin Corp. until June of 1966, and to obtain your full compensation from it.

This supersedes any and all prior written and oral agreements between us. Except for our respective obligations contained herein, you release and discharge me, and I release and discharge you, from any and all claims, demands, obligations and liabilities of every kind or nature whatsoever arising out of any matter prior to the date hereof.

Each of the foregoing commitments and the foregoing mutual release are contingent upon the consummation of the pending sale by me of shares of Pacific Vitamin Corp. to Nutrilite Products, Inc.

Please indicate your agreement to the foregoing in the space provided below for that purpose.

Yours very truly,

(Signed)   David Vickter
DAVID VICKTER

Agreed:
(Signed)   Ira Hirsch
IRA HIRSCH

The $33,000 amount was paid pursuant to the agreement.

Prior to the execution of the above agreement, there had been some discussion between Vickter and Ira as to Vickter's obligation to Ira in the event that Vickter sold part or all of his interest in Pacific. An understanding was reached to the effect that Ira would be entitled

to compensation from Vickter in such an event, however, no binding contract was made, any obligation on Vickter's part being no more than a moral one.

Originally Vickter and Ira had thought that 25 percent of the proceeds Vickter received over $100,000 for his stock should be the measure of Ira's compensation. When the transaction with Nutrilite was in the negotiating stage, Vickter refused to give Ira as much as $100,000 when he was contemplating the receipt of $500,000 from Nutrilite. Vickter and Ira finally agreed that Ira would receive a total of $50,000 if the sale took place. Thirty-three thousand dollars of the $50,000 was to be payable as described above. The remaining $17,000 was to be paid by having Vickter's salary from Pacific reduced $100 per week for 42 months, and increasing Ira's by that amount.

On his income tax return for 1962 and 1963, Ira reported receipts of $20,000 and $13,000, respectively, as long-term capital gains resulting from the sale of assets acquired in 1959 at a zero basis. In his statutory notice of deficiency for the calendar years 1962 and 1963, respondent determined the amounts received to be ordinary income.

### ULTIMATE FINDING OF FACT

The $33,000 amount received by Ira pursuant to the agreement of December 14, 1962, represented compensation for past services rendered and for future services to be rendered to Pacific.

### OPINION

#### Stock Option Issue

On March 1, 1961, Ira Hirsch entered into an employment agreement which, *inter alia*, gave him the right to purchase $26,250 worth of Pacific Vitamin Corp. stock for $1,250, if that stock were offered to the public. Subsequently a public offering of Pacific stock was made and on July 3, 1961, Ira exercised his option.

The parties agree that the option in issue is a so-called nonstatutory stock option which had no ascertainable market value when it was granted. They also agree that at the time Ira exercised the option, he had an unrestricted right to the Pacific shares. What is unsettled is whether, under section 61 of the Internal Revenue Code,[2] at the time of exercise or at any time during the years in issue, Ira realized taxable compensation because of the exercise of the option.

The relevant regulation is section 1.421-6, Income Tax Regs., titled "Options to which section 421 [pertaining to restricted employee stock options] does not apply."

[2] All references are to the Internal Revenue Code of 1954.

The section of the regulation applicable to the instant case is 1.421–6(d) ("Options without a readily ascertainable fair market value"), which in relevant part reads as follows:

(d)(1) Except as provided in subparagraph (2) of this paragraph, if the option is exercised by the person to whom it was granted, the employee realizes compensation at the time an unconditional right to receive the property subject to the option is acquired by such person, and the amount of such compensation is the difference between the amount payable for the property and the fair market value of the property at the time an unconditional right to receive the property is acquired. * * *

(2)(i) If the option is exercised by the person to whom it was granted but, at the time an unconditional right to receive the property subject to the option is acquired by such person, such property is subject to a restriction *which has a significant effect on its value*, the employee realizes compensation at the time such restriction lapses or at the time the property is sold or exchanged, in an arm's length transaction, whichever occurs earlier, * * * [Emphasis supplied.]

Petitioner contends that at all relevant times his stock in Pacific was subject to a restriction which had a "significant effect on its value," that such restriction has not lapsed, and thus no income is to be recognized by him. Respondent denies that there were any such restrictions.

We find and hold that there were in fact significant restrictions on the salability of the shares in issue, which did have a significant effect on the stock's value.

When Ira exercised his option, he agreed in writing that he was not going to sell the stock for a period of 6 months from the date of purchase. The existence of this writing alone would have been sufficient to restrict the marketability of the stock when its existence was made known to a prospective buyer. Two witnesses called by petitioners, Patrick MacIntyre, a stockbroker, and Carl Gebhart, the vice president of a firm experienced in marketing securities, both testified that where such a writing existed there would be a "significant effect" on the fair market value of the stock, and that they would have great difficulty in selling such stock. In addition, MacIntyre testified that as a broker he would not have "touched" the stock during the term of the letter.

Respondent contends that there is no evidence that Ira actually was bound to hold the stock for 6 months from the date of exercise because no agreement showing that Vickter made a representation that he would not sell his shares for a period of 6 months was introduced into evidence. He concludes that in the absence of proof that the agreement was signed, the representation in Ira's letter of exercise was not really required or a true restriction.

It is true that the agreement which David Vickter and the other shareholders possibly signed is not in evidence. However, even if there were no such agreement, Ira's shares were still severely affected.

Paragraph 3(a)(iii) of his employment agreement dated March 1, 1961, required Ira to execute an agreement limiting his right to dispose of or encumber his Pacific stock, identical in terms to any such agreement signed by David Vickter. The offering circular of Pacific dated June 22, 1961, stated that the present stockholders had agreed not to sell any of their shares for a period of 6 months after the initial public offering. There is no question that David Vickter was a shareholder of Pacific during this period. We find that the provision of the employment agreement, in conjunction with the statement in the prospectus, was sufficient to put a severe restriction on the salability of Ira's shares regardless of whether such an agreement had in fact been signed by Vickter. Ira's agreement was merely cumulative to a restriction already present.

Ira's agreement not to sell his Pacific shares was not the only restriction affecting their value. There was also the possibility that a sale of his shares at any time during the period in issue would have been in violation of the Securities Act of 1933. As is shown in the Findings of Fact, from January 2, 1962, through July 27, 1965, Ira twice attempted to obtain a ruling from the SEC that a sale by him of his shares would not be in violation of such Act. Both times the SEC refused to give such a ruling. The reply, dated February 1, 1962, specifically states that a sale of Pacific shares by Ira would be in violation of section 5 of the Act. Since neither Ira's circumstances nor the Securities Act of 1933 changed materially if at all from July 3, 1961, the date he exercised the options, to February 1, 1962, or thereafter, we conclude that the SEC would have issued a similar ruling if the request had been made on July 3, 1961, when the option was first exercised.

Even if we were to assume that a sale of Ira's shares would not have violated the 1933 Act, the SEC's position that it would consider any sale without prior registration as a violation is a restriction which has a significant effect on the value of the stock.

Respondent next contends that any SEC difficulties could have been avoided if Ira had had his Pacific stock included within the original public offering which Vickter made under the regulation A exemption. For reasons unexplained, he concludes that Ira could have had his shares included within the original registration; that his failure to do so amounted to a voluntary act on his part; and that therefore, we are foreclosed from considering whatever effect on the fair market value of the stock the registration (or failure to register) may have had.

We have grave doubts that the power to voluntarily take steps to remove a restriction negates the restriction for purposes of section 1.421–6(d)(2)(i), Income Tax Regs., *supra*. But even assuming that it does, we cannot find, and may not simply assume that Ira had the power to have his stock registered with Vickter's shares.

One glaring weakness in respondent's argument is the fact that the original public offering had to occur, and did in fact occur before Ira was eligible to purchase any of his Pacific shares. It follows that shares which he did not own could not have been included in such public offering.

In addition, there is nothing in the employment agreement which gave Ira the right to have his shares registered. The provision in the agreement to which respondent apparently refers is paragraph 3(a) (iii), which reads as follows:

(iii) It is understood that in the event of a public issue, you will execute whatever agreements limiting your right to dispose of or encumber our stock as may be executed by Mr. David Vickter.

As we pointed out above, that provision required Ira to agree to restrict the salability of his stock if Vickter did so. It did not release him from a restriction if Vickter was released.

Further, we find and hold that the above provision referred only to any shares which Vickter still owned after any public offering. No other reading of the provision is possible.

Respondent next contends that despite the language of the SEC's letter, the stock could have been sold without violating any law, and that therefore there was no effect on the value of the stock. He contends, and Carl Gebhart testified, that shares of stock sold through a private placement or through an intrastate sale would have avoided the provisions of the 1933 Act. However, Gebhart further testified that a sale of stock such as Ira's, under such circumstances, was usually completed at a minimum discount of from 20 to 50 percent from the fair market value of unrestricted stock, and that in order to have qualified Ira's stock for a public sale at the fair market value of the stock under the 1933 Act, would have cost a minimum of $3,000 to $6,000.

Respondent admits that the term "restriction which has a significant effect on its value" is not defined by the regulations, nevertheless he insists that Ira's stock does not fall within the definition for any period prior to January 1, 1963. He concedes that Ira's agreement of that date with Nutrilite (restricting Ira's right to sell Pacific shares) was a "significant restriction" within the definition of the regulations.

On consideration of the entire record, we find and hold that petitioner acquired and held his Pacific stock subject to a "restriction which had a significant effect on its value" at all relevant times.

Rev. Rul. 68–86, 1968–1 C.B. 184, postulates the situation of an employee who has the option of receiving a bonus in cash or stock of his employer. Basically the only restriction on the transfer of the shares is that the employee must obtain the prior written consent of the salary committee of the board of directors of his employer. In such a circumstance respondent concluded that the restriction imposed had

the requisite significant effect on the value of the stock to prevent recognition of income upon its receipt. We cannot conceive of any plausible reason why the employee in the above ruling could be considered subject to a greater restriction than petitioner in the instant case. We conclude that Ira was not required to recognize any income upon the exercise of the option in issue or at any time thereafter during the years in issue.

As far as we can determine, this is the first case to fall within the scope of section 1.421–6, Income Tax Regs., where the question is whether the stock was subject to a restriction which had a significant effect on its value. Stock acquired prior to September 25, 1959, which could be considered to be subject to a restriction having a significant effect on its value is not included within the scope of section 1.421–6 (d) (2).[3] See *Victorson* v. *Commissioner*, 326 F. 2d 264 (C.A. 2, 1963), affirming a Memorandum Opinion of this Court.

Options exercised prior to September 25, 1959, are taxable to an employee at the time of exercise no matter what the restriction so long as a fair market value for the stock can be ascertained. Those cases cited by respondent which hold an employee taxable on the exercise of an option, despite restrictions, all involved options exercised prior to September 25, 1959, and are consequently not in point. The question in those cases was whether the stock had a fair market value at the time the option in question was exercised—not whether any restrictions affecting salability of the shares had a significant effect on the value of the stock, which is the precise question in the instant case.

We note, however, that in those cases where there were restrictions on the stock similar to those described in the instant case, the valuation of the shares was in fact reduced from the fair market value of unrestricted stock. See *Edith G. Goldwasser*, 47 B.T.A. 445 (1942), affd. 142 F. 2d 556 (C.A. 2, 1944), certiorari denied 323 U.S. 765; *MacDonald* v. *Commissioner*, 230 F. 2d 534 (C.A. 7, 1956), reversing on other grounds 23 T.C. 227 (1954).[4]

## *Ordinary Income or Capital Asset Issue*

In 1962 and 1963, Ira received a total of $33,000 from David Vickter, both pursuant to a written agreement between himself and David

---

[3] Sec. 1.421–6(a) Options to which section 421 does not apply.

(2) This section is applicable only to options granted on or after February 26, 1945, except that this section is not applicable to—

(i) Property transferred pursuant to an option exercised before September 25, 1959, if the property is transferred subject to a restriction which has a significant effect on its value, or

[4] In the Memorandum Opinions of this Court cited by respondent involving the exercise of stock options, we similarly reduced the valuation of shares from their unrestricted fair market value under circumstances similar to that in the instant case. See *Thomas Conroy*, T.C. Memo. 1958–6; and *Harry Simmons*, T.C. Memo. 1964–237.

Vickter and as third-party beneficiary of a stock purchase agreement between Vickter and Nutrilite Products, Inc., calling for the payment.

On his income tax returns for 1962 and 1963, Ira reported the amounts received ($20,000 in 1962 and $13,000 in 1963) as a long-term capital gain from the sale of a capital asset "Pacific Vitamin."

Petitioner contends that his treatment of the above amounts is justified because he had held a "property interest" in the Pacific stock which Vickter sold to Nutrilite Products, Inc. He argues that he and Vickter had agreed orally that Ira was to receive 25 percent of any proceeds over $100,000, which Vickter would derive from the sale of Pacific shares in Vickter's name. The consideration for the alleged agreement was Ira's past and continued participation as an employee of Pacific.[5]

When Vickter actually received $500,000 from Nutrilite Products, Inc., from the sale of Pacific stock, Ira, under the above analysis, should have received $100,000. Supposedly there was a compromise and Vickter agreed to pay Ira $50,000, by means of a salary increase of $100 a week for 42 months and the $33,000 amount in issue.

After evaluating the testimony of Ira, Vickter, and Alexander Jablow, a former treasurer and director of Pacific, we have concluded and found that there was no definite agreement entered into which was considered binding by either Ira or Vickter prior to the sale of Vickter's Pacific stock. At one point, Vickter himself testified that he felt his commitment to Ira was no more than a moral one to compensate Vickter for past services.

Respondent contends that the entire $33,000 payment was paid pursuant to Vickter's stock purchase agreement with Nutrilite (reproduced in part in the Findings of Fact), which agreement called for Vickter to pay Ira $33,000 to induce Ira to enter into an employment agreement with the new management of Pacific.

We have concluded that the $33,000 payment was probably both a reward from Vickter to Ira for past services rendered, and an inducement to Ira to sign a new employment agreement with Pacific under the auspices of Nutrilite. No monetary allocation between such elements is necessary, because amounts received under each have no characteristics other than those of ordinary income.

We find and hold that Ira never had any rights in either Vickter's stock or the proceeds from its sale prior to his receipts of the $20,000 and $13,000 payments. Even if we did find that such $33,000 was paid

[5] Petitioner also contends that he had foregone an option which he had had to purchase some of Vickter's Pacific shares as consideration for this "agreement," but the record fails to support such contention.

pursuant to the alleged oral agreement, it is clear that such payments were nothing more nor less than compensation for personal services.

Petitioner would have us find that if Ira had the right to a percentage of the proceeds to be derived from the sale of Vickter's shares, he had acquired a capital asset in Pacific. The law is clear that this type of "property interest" assumes the character of the consideration given in exchange, and under the facts of the instant case Ira's interest was not a capital asset, and its realization cannot be a capital gain under section 1222(3) of the Code.[6]

Where an employee becomes entitled to a percentage of the proceeds from the sale of an asset, as compensation for services rendered or to be rendered, the right he receives is characterized as a right to a payment for services. Whether this right is sold to a third party or is satisfied by payment, it is now well settled that the proceeds are taxed as ordinary income. *Merton E. Farr*, 11 T.C. 552 (1948), affirmed sub nom. *Sloane* v. *Commissioner*, 188 F. 2d 254 (C.A. 6, 1951) ; *Frank Hodous*, 14 T.C. 1301 (1950) ; *Craig M. Smith*, 33 T.C. 465 (1959), affirmed on this point 313 F. 2d 724 (C.A. 8, 1963) ; *Pounds* v. *United States*, 372 F. 2d 342 (C.A. 5, 1967).

In this regard, our discussion of *Strauss* v. *Commissioner*, 168 F. 2d 441 (C.A. 2, 1948), reversing 8 T.C. 1058 (1947), in *Merton E. Farr*, *supra*, is appropriate to petitioner's contention (p. 561) :

> The * * * case of *Strauss* v. *Commissioner, supra,* presents a fact situation comparable to the facts here. There the owners of a patent assigned a portion of the royalty payments thereon to the taxpayer as compensation for past services rendered. The court determined that by this assignment the taxpayer received no legal or equitable interest in the patent. The court stated in part:
> " * * * The taxpayer did not receive for those services any part of the Kodachrome process itself or any right to control the disposition of that process. Rather, he obtained the enforceable promise of the owners of the process that he would be paid for his services a definite portion of the royalties they had the right to receive from the Eastman Kodak Company. That is to say, his "interest in the process" was never greater than a contract right to be paid certain ascertainable sums of money. From first to last his pay for his services was to be only in money determinable in amount by reference to a royalty agreement covering the process. * * * "

We hold that the payments in issue, totaling $33,000, constituted ordinary income of petitioner in amounts of $20,000 in 1962 and $13,000 in 1963.

*Decision will be entered under Rule 50.*

---

[6] SEC. 1222. OTHER TERMS RELATING TO CAPITAL GAINS AND LOSSES.

(3) LONG-TERM CAPITAL GAIN.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing taxable income.