ALAN J. BAYLEY AND BARBARA F. BAYLEY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8992–73.     Filed November 15, 1977.

*Lawrence A. Aufmuth* and *Arthur C. Rinsky,* for the petitioners.

*Eugene H. Ciranni,* for the respondent.

FORRESTER, *Judge:* Respondent has determined a deficiency in petitioners' Federal income tax for the taxable year 1968 in the amount of $16,922.95. There are two issues for our decision: (1) Whether the stock issued to petitioner Alan J. Bayley in 1966 as compensation for promotional services was subject to restrictions which had a significant effect on its value; and, if so, (2) whether such restrictions were removed, or ceased to have a significant effect on such stock's value during 1968.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners Alan J. and Barbara F. Bayley, husband and wife, resided in Los Altos, Calif., at the time they filed the petition herein. Petitioners filed a joint Federal income tax return, and amended joint return, for the taxable year 1968 with the Office of the Internal Revenue Service at San Francisco, Calif.

Since 1966, petitioner Alan J. Bayley (Bayley) has been president and a member of the board of directors of General Recorded Tape, Inc. (GRT), which is engaged in the business of producing and selling prerecorded music tapes. Pursuant to a permit issued by the California Comissioner of Corporations (Commissioner of Corporations), dated August 11, 1965, GRT issued to Bayley a certificate for 5,000 shares of its stock (1965 stock) as compensation for his organizational efforts and other services rendered to or on behalf of GRT. The conditions of the August 11, 1965, permit required Bayley (1) to deposit in escrow the 1965 stock issued directly to him pursuant to that permit and (2) to enter into an agreement with GRT providing that the 1965 stock would be subject to limitations on its liquidation, dividend, and voting rights. Bayley complied with both of these requirements (hereinafter collectively referred to as promotional restrictions).

The August 11, 1965, permit was amended by a permit dated March 16, 1966, in which the Commissioner of Corporations authorized the issuance of a new stock certificate for 5,000 shares of GRT stock (1966 stock) to Bayley in consideration for his cancellation of the certificate for the 1965 stock. The same promotional restrictions were continued in force and Bayley complied with these conditions.

No further permits or other orders affecting Bayley's promotional shares were issued by the Commissioner of Corporations until he issued a permit dated July 25, 1968, authorizing GRT to issue shares in accordance with an application filed by it on June 14, 1968. The July 25, 1968, permit provided, in part, as follows:

This PERMIT is issued upon the following conditions:

(a) That none of the shares issued in exchange for shares authorized by paragraph 2 of the permit dated March 16, 1966, as amended, shall be sold or issued unless and until NEWELL ASSOCIATES, INC., and ALAN J. BAYLEY shall have executed an agreement with applicant in writing, and

filed a copy thereof with the Commissioner of Corporations, whereby they shall agree, for themselves, their successors, assigns, heirs, administrators and executors, that all shares issued pursuant to said paragraph shall be subject to the following disabilities unless and until the Commissioner shall, by an amendment to this permit, delete this condition, the Comissioner of Corporations reserving at all times the power to amend the provisions of this condition and this permit:

1. Such shares shall not participate in any cash, shares or property dividend paid by the applicant.

2. Such shares shall not participate in any distribution of assets by the applicant to its shareholders.

3. From and after July 2, 1973, such shares shall not be entitled to vote unless or until the Commissioner has amended this permit to delete the provisions of this condition.

Neither the applicant nor any holder of shares issued pursuant to said paragraph shall be deemed entitled to have this permit amended to delete this condition unless an application shall have been filed with the Commissioner showing, by means of audited and certified financial statements prepared in accordance with generally accepted accounting principles, that applicant is in sound financial condition and has had aggregate annual earnings averaged over a period of three successive years of not less than 15% on the average invested capital as computed for such period.

Neither applicant nor any other person shall take or solicit waivers of all or part of this condition, or any agreement executed pursuant thereto, unless the written authorization of the Commissioner so to do first shall have been obtained.

(b) That when issued all documents evidencing any of the securities referred to in condition (a) hereof authorized by paragraph 1 hereof shall be forthwith deposited with the escrow holder heretofore selected by applicant and approved in writing by the Commissioner of Corporations, to be held as an escrow pending the further written order of said Commissioner; that the receipt of said escrow holder for said documents shall be filed with said Commissioner; and that the owner or persons entitled to said securities shall not consummate a sale or transfer of said securities, or any interest therein, or receive any consideration therefor, until the written consent of said Commissioner shall have been obtained so to do.

(c) That all certificates evidencing any of the securities authorized by paragraph 1 hereof (except those referred to in conditions (a) and (b) hereof), shall at all times bear upon their face and reverse sides a legend, clearly and prominently stamped thereon and in capital letters of not less than ten-point type, reading as follows:

"IT IS UNLAWFUL TO CONSUMMATE A SALE OR TRANSFER OF THIS SECURITY, OR ANY INTEREST THEREIN, OR TO RECEIVE ANY CONSIDERATION THEREFOR, WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA, NAMING BOTH TRANSFEROR AND TRANSFEREE, EXCEPT THAT TRANSFERS MAY BE EFFECTED WITHOUT SUCH CONSENT TO THE TRANSFEROR'S PARENTS, CHILDREN, GRAND-

CHILDREN, SPOUSE, AND CUSTODIANS OR TRUSTEES FOR THEIR ACCOUNT, OR TO HOLDERS OF SECURITIES OF THE SAME CLASS OF THE ISSUER OF THIS SECURITY, ON CONDITION THAT ANY CERTIFICATE EVIDENCING THIS SECURITY ISSUED TO SUCH TRANSFEREE, SHALL CONTAIN THIS LEGEND CONDITION."

Bayley complied with conditions (a) and (b) of the July 25, 1968, permit.

On August 22, 1968, the Commissioner of Corporations issued an Order Terminating Escrow (hereinafter Order) of "the issued and outstanding shares for which provision was made" in the July 25, 1968, permit. On August 22, 1968, the Commissioner of Corporations also issued an Amendment to Permit (hereinafter Amendment) which specifically deleted conditions (b) and (c) from the July 25, 1968, permit. No other permits or orders have ever been issued by the Commissioner of Corporations affecting the July 25, 1968, permit.

The promotional restrictions imposed upon Bayley's stock were typical of the kind of promotional restrictions which the Commissioner of Corporations imposed on promotional stock during 1966. Prior to 1969, the Commissioner of Corporations enforced promotional restrictions solely by means of an escrow whereby the restricted stock could not be transferred by the escrow agent without the order of the Commissioner of Corporations, and he never terminated an escrow without terminating the other promotional restrictions at the same time. Aside from the instant case, there has never been another instance in which the Commissioner of Corporations provided for the removal of the limitations on the liquidation, dividend, and voting rights of restricted stock solely by an amendment to permit. A person with substantial experience in dealing with the application and removal of promotional restrictions, such as those involved in this case, would be likely to conclude after an examination of the GRT file that the Order of August 22, 1968, removed all of the restrictions on petitioner's stock.

The Commissioner of Corporations maintains that the Order and the Amendment "inartfully" terminated all of the promotional restrictions on petitioner's stock. If asked to do so, the Commissioner of Corporations would issue an order, or amendment to permit, specifically deleting condition (a) from the July 25, 1968, permit.

The Commissioner of Corporations' file pertaining to GRT

(file No. 5000502) consists of both a public and private file. The public file contains applications filed with the Commissioner of Corporations as well as the responses, orders and permits issued by him in response to such applications. The private file contains internal memoranda of the Commissioner of Corporations' office with respect to applications. All public files more than 4 years old are routinely destroyed to that the original public file pertaining to GRT has been destroyed, but microfilm copies of the permits and orders, but not applications, from such file have been retained.

The private file pertaining to GRT contains a memorandum dated August 21, 1968, which reads, in part, as follows:

Amendment to the following permits:
PERMIT dated July 25, 1968, by deleting conditions [at this point the letters (a) and (b) have both been typed on top of one another] and (c) therefrom, together with ORDER TERMINATING ESCROW

*　　　*　　　*　　　*　　　*　　　*　　　*

MEMORANDUM OF FINDINGS

*　　　*　　　*　　　*　　　*　　　*　　　*

Applicant also seeks an amendment to the permit dated July 25, 1968, to delete the escrow condition, as the analysis of Mr. Mattes shows applicant's financial condition warrants the removal of the escrow and legend condition.
Recommended.

Mr. Mattes' analysis relates to the propriety of removing the limitations on liquidation, dividend, and voting right from petitioner's stock.

John Freidenrich (Freidenrich) is an attorney who has practiced law since 1964. He has specialized in corporate securities and business transactions and has had frequent dealings with the Commissioner of Corporations so that he was familiar with his policies, procedures, and rules during the period in question. Freidenrich has served as an assistant secretary of GRT and, in 1968, he was involved with obtaining the Federal securities registration and California registration of a public offering of GRT stock. On September 1, 1970, Freidenrich wrote a letter stating, in part, as follows:

4. On August 22, 1968, the Commissioner of Corporations issued his Order Terminating Escrow and his Amendment to Permit dated the same date under the terms of which he removed the shares of common stock from the escrow

conditions and released the shares from all of the restrictions and conditions previously imposed thereon.

He believed such to be the case because an order terminating escrow was the typical way in which such restrictions were removed by the Commissioner of Corporations during the relevant period.

In 1966, there was a significant difference in value between GRT stock subject to the promotional restrictions and unrestricted GRT stock. The fair market value in 1966 of 5,000 shares of GRT stock that were not subject to promotional restrictions such as those imposed on the 1966 stock by the March 16, 1966, permit was $10 per share, or $50,000. The fair market value in 1966 of 5,000 shares of GRT stock that were subject to such promotional restrictions was $0.509 per share, or $2,545. The fair market value on August 22, 1968, of 5,000 shares of GRT stock that were not subject to such promotional restrictions was at least $10 per share, or $50,000. None of the 1966 stock was sold or otherwise transferred by Bayley prior to January 1, 1969. In 1969 Bayley transferred some of the 1966 stock. As long as the promotional restrictions were in force, petitioner's stock could be transferred, but only subject to such restrictions.

All of the promotional restrictions imposed on the 1966 stock were imposed by the Commissioner of Corporations pursuant to the administrative discretion granted to him under California law. The removal of such promotional restrictions remained in his discretion at all times relevant to this case.

Petitioners filed a timely 1966 joint Federal income tax return, and in such return the receipt of the 1966 stock by Bayley was reported as a short-term capital gain in the amount of $2,545.[1] In his statutory notice, respondent determined that, during the taxable year 1968, Bayley realized $50,000 of ordinary income from the GRT stock which he had received in 1966.

OPINION

Petitioner argues that sections 1.61–2(d)(5)[2] and 1.421–6(d)

---

[1] Petitioner timely filed a claim for refund so that if respondent prevails in the instant case, he will be entitled to a refund equal to the amount of taxes paid on such amount.

[2] Sec. 1.61–2(d)(5). *Property transferred subject to restrictions.* Notwithstanding any other provision of this paragraph, with respect to any property, other than an option to purchase stock or property, which is transferred by an employer to an employee or independent contractor as compensation for services, and which is subject to a restriction which has a significant effect on its value, *the rules of*

(2),[3] Income Tax Regs., are inapplicable for two reasons: (1) The 1966 stock issued to petitioner represented a second class of stock rather than stock subject to restrictions; and (2) since the restrictions on the 1966 stock were imposed by the Commissioner of Corporations, rather than by a contract between petitioner and GRT, they are not "restrictions" as that term is used in the regulations.

Petitioner cites Rev. Rul. 71–522, 1971–2 C.B. 316, and *Paige v. United States,* an unreported case (C.D. Cal. 1975, 36 AFTR 2d 75–5408, 75–2 USTC par. 9587)[4] in support of his argument that the 1966 stock represents a second class of stock, rather than restricted stock. Unfortunately, petitioner's argument misses the point. We have repeatedly stated that the purpose of the section 1371(a)(4)[5] requirement that a "small business corporation" have only one class of stock is to make the passthrough provisions of subchapter S workable and to avoid the complications inherent in passing the earnings of a corporation through to shareholders who hold stock with different rights. *Parker Oil Co. v. Commissioner,* 58 T.C. 985, 990 (1972); *Stinnett v. Commissioner,* 54 T.C. 221, 235 (1970); *Gamman v. Commissioner,* 46 T.C. 1, 7–8 (1966). It is clear that such purpose is irrelevant to the question posed herein as to whether petitioner's stock was

---

paragraph *(d)(2) of section 1.421–6 shall be applied in determining the time and the amount of compensation to be included in the gross income of the employee or independent contractor.* * * * This subparagraph is applicable only to transfers after September 24, 1959. [Emphasis supplied to clarify that it is the "option" regulation which is applicable in the instant case.]

[3]Sec. 1.421–6(d). *Options without a readily ascertainable fair market value.* If there is granted an option to which this section applies, and if the option does not have a readily ascertainable fair market value at the time it is granted, the employee in connection with whose employment the option is granted is considered to realize compensation includible in gross income under section 61 at the time and in the amount determined in accordance with the following rules of this paragraph:

* * * * * * *

(2)(i) If the option is exercised by the person to whom it was granted but, at the time an unconditional right to receive the property subject to the option is acquired by such person, such property is subject to a restriction which has a significant effect on its value, the employee realizes compensation at the time such restriction lapses or at the time the property is sold or exchanged, in an arm's length transaction, whichever occurs earlier, and the amount of such compensation is the lesser of—

(*a*) The difference between the amount paid for the property and the fair market value of the property (determined without regard to the restriction) at the time of its acquisition, or

(*b* ) The difference between the amount paid for the property and either its fair market value at the time the restriction lapses or the consideration received upon the sale or exchange, whichever is applicable. * * *

[4]These authorities deal with the question of whether stock subject to promotional restrictions is a second class of stock for purposes of subch. S of the Internal Revenue Code of 1954.

[5]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.

subject to a "restriction which has a significant effect on its value," secs. 1.61–2(d)(5) and 1.421–6(d)(2)(i), Income Tax Regs. In *Stinnett v. Commissioner, supra*, we decided that certain advances to a corporation, designated as debt and evidenced by installment notes, did not result in the corporation having more than one class of stock even though such notes might have represented equity interests for other pruposes. In *Stinnett*, we said (54 T.C. at 232):

> We do not have to decide whether the notes involved in this case might nevertheless be treated as "equity" for other purposes. We are not here concerned with the treatment of interest paid on those notes. In fact, no interest was paid. Nor are we concerned with characterizing the transaction to determine whether petitioners might have a bad debt loss in the event of worthlessness. We are not even concerned with the question whether such debt may not be treated differently under other provisions of the tax laws, even in the case of a corporation which has elected to be taxed under subchapter S. For example, there might be situations in which earnings accumulated prior to qualification under subchapter S are sought to be distributed to a stockholder-creditor of the corporation in the "guise" of repayment of debt.
>
> All we are called upon to decide is whether the corporation (International Meadows) had outstanding more than "one class" of stock within the meaning of section 1371 of the Code. * * *

Sections 1.61–2(d)(5) and 1.421–6(d)(2)(i), Income Tax Regs., apply broadly to *any* property "which is transferred * * * to an employee or independent contractor as compensation for services, and which is subject to a restriction which has a significant effect on its value." In the instant case, the parties anticipated that the promotional restrictions would be terminated by the Commissioner of Corporations if the corporation were financially successful, and the permits included provisions specifying the procedure by which the promotional restrictions could be terminated. Of course, when such termination occurs, the "second class of stock" concept which petitioner urges will terminate and all of the stock issued pursuant to the July 25, 1968, permit will become the same type and class of stock. This situation is clearly within the reach of sections 1.61–2(d)(5) and 1.421–6(d)(2)(i), Income Tax Regs. Accordingly, we hold that petitioner's stock is stock received as compensation for services, and is subject to a restriction significantly affecting its value, rather than a second class of unrestricted stock.

Petitioner relies upon *Frank v. Commissioner*, 447 F.2d 552 (7th Cir. 1971), affg. 54 T.C. 75 (1970), in arguing that the

promotional restrictions were not "restrictions" within the meaning of sections 1.61–2(d)(5) and 1.421–6(d)(2)(i), Income Tax Regs., because such restrictions were imposed by the Commissioner of Corporations pursuant to California securities laws rather than by private contract.

In *Hirsch v. Commissioner*, 51 T.C. 121, 135–137 (1968), we held the possibility that a sale of Hirsch's shares would violate the Securities Act of 1933 to be a restriction within the meaning of sections 1.61–2(d)(5) and 1.421–6(d)(2)(i), Income Tax Regs. In such case, the employer corporation had made a public offering before Hirsch acquired his stock in the corporation, but Hirsch's stock was not part of such public offering. Hirsch's stock was issued in reliance upon the private offering exemption from registration under the Securities Act of 1933 (Securities Act). To qualify for such exemption, Hirsch represented that he took such shares for investment and not with a view to distribution. The SEC twice refused to allow the public sale of Hirsch's shares without registration. The SEC first refused because such a sale would destroy the private offering exemption relied upon in issuing Hirsch's stock and a second time because Hirsch was a "control" person of the employer corporation. In *Hirsch* we found as a fact (51 T.C. at 130) the following:

> Had Ira attempted to sell his shares of Pacific at any time from the date of issue, he would have had quite a difficult time. *Under his peculiar circumstances*, there would have been few buyers willing to purchase his shares. Any buyer willing to purchase his shares, assuming that this could be done legally, would have demanded a discount of at least 15 to 20 percent *from the quoted over-the-counter prices*. Even if Ira could have registered his shares under regulation A of the Securities Act of 1937, it would have cost him a minimum of $3,000 to $6,000 to do so. [Emphasis supplied.]

Therefore, it was clear that the Securities Act restrictions applicable to Hirsch's stock had a significant effect on its value.

In *Frank v. Commissioner*, 54 T.C. 75 (1970), we distinguished *Hirsch v. Commissioner, supra*, as follows (54 T.C. at 96):

> we do not find the *Hirsch* doctrine to be controlling in the instant case. Unlike the taxpayer in *Hirsch*, petitioner acquired freely transferable stock which was not subject to investment letter restrictions. Furthermore, in *Hirsch* the Court was comparing the taxpayer's unregistered shares to outstanding registered shares. In this case, approximately 83 percent of the outstanding stock was not registered with the SEC and the remainder was subject to investment letter restriction. *Thus, in the marketplace petitioner's stock would not be considered inferior to the outstanding shares, and there would not be a discount based upon*

*dissimilarity of petitioner's shares from those outstanding as was the case in Hirsch.* [Emphasis supplied.]

In addition to their other requirements which are not involved herein, section 1.61–2(d)(5) and 1.421–6(d)(2)(i), Income Tax Regs., are applicable only if (1) the transferred property is subject to a "restriction" within the meaning of such regulations and (2) such restriction has a "significant effect on its value." In *Frank,* we distinguished *Hirsch* with respect to requirement (2) because under the facts of that case we believed the Securities Act restrictions did not have a significant effect on the value of Frank's shares.[6] In *Frank,* we found only two factors, the large size of Frank's holdings and the impact of rapid price fluctuations on prospective purchasers in a private placement sale, to have an effect on the value of Frank's stock and we held that those factors did not constitute "restrictions." Since we found that the Securities Act restrictions had no significant effect on value, we did not reach the question of whether securities law restrictions were "restrictions" for purposes of sections 1.61–2(d)(5) and 1.421–6(d)(2)(i), Income Tax Regs., and, accordingly, did not attempt to distinguish *Hirsch* with respect to that issue.

Since the parties in the instant case have stipulated that in 1966 there was a significant difference in value between GRT stock subject to promotional restrictions and similar stock which was unrestricted, the instant case is distinguishable from *Frank* because the promotional restrictions did have a significant effect on the value of Bayley's stock. With respect to whether restrictions imposed by governmental agencies are "restrictions" within the meaning of sections 1.61–2(d)(5) and 1.421–6(d)(2)(i), Income Tax Regs., our decision in *Hirsch v. Commissioner* is controlling.

We realize that in affirming our decision in *Frank,* 447 F.2d 552 (1971), the majority of the Seventh Circuit Court of Appeals held that *Frank* and *Hirsch* were indistinguishable and that the decision in *Hirsch* was erroneous "in that we do not believe restrictions on transferability arising by operation of securities law were intended to be included within the meaning of the

---

[6] We did not decide in *Frank v. Commissioner,* 54 T.C. 75 (1970), affd. 447 F.2d 552 (7th Cir. 1971), and do not decide in the instant case, that restrictions can *never* significantly affect value in the absence of dissimilarity of the taxpayer's shares from other outstanding shares. There may be instances where restrictions placed on *all* outstanding stock of a corporation significantly affect the value of all such stock.

applicable Treasury Regulation." 447 F.2d 556. As stated above, *supra* at pp. 241–243, we believe *Frank* and *Hirsch* to be validly distinguishable upon the ground that the securities law restrictions in *Frank* did not significantly affect the value of his stock.

After carefully considering both the majority and dissenting opinions of the Seventh Circuit Court of Appeals in the *Frank* case, we are convinced that *Hirsch* was correctly decided. The majority, in holding that *Hirsch* was incorrectly decided, relied entirely upon (1) Rev. Rul. 68–286, 1968–1 C.B. 185, which states that the provisions of section 16(b) of the Securities Exchange Act of 1934[7] do not constitute restrictions significantly affecting the value of stock held by an "insider," and (2) the fact that all of the examples of the operation of section 1.421–6(d)(2)(i), Income Tax Regs., which are given in section 1.421–6(d)(2)(ii), Income Tax Regs., involved *contractual* limitations.

We do not believe that Rev. Rul. 68–286 is contrary to our decision in *Hirsch* since we believe it was based on the premise that section 16(b) restrictions do not "significantly" affect value rather than that the section 16(b) restrictions are not "restrictions" within the meaning of the applicable regulations. A buyer (unless he, too, is an "insider") will take an "insider's" stock free from the restrictions of section 16(b) so that such restrictions do not affect the value of such stock in the eyes of the purchaser. The value of such stock to the selling "insider" will be reduced, not because its market value is reduced, but only because he must return any "insider profit" to his company. In contrast, petitioner's stock could only be transferred subject to the promotional restrictions so that its market value was significantly affected.

We also are unpersuaded that securities law restrictions are outside the scope of sections 1.61–2(d)(5) and 1.421–6(d)(2)(i) Income Tax Regs., merely because all of the examples given in section 1.421–6(d)(2)(ii), Income Tax Regs., involved contractual limitations. As the dissenting opinion in *Frank v. Commissioner*, 447 F.2d 552, 561 (7th Cir. 1971), stated:

it appears to me that a restriction which has a significant effect on its value is not limited as to source and if the Securities Act of 1933 in its operation restricts the ready sale of a security then it is squarely a restriction within the

---

[7]Under sec. 16(b) of the Securities Exchange Act of 1934, if an "insider" sells any equity security of his employer within a period of less than 6 months before or after the date that he received it, then he may be required to return to his company the "insider profit" realized on the purchase and sale.

meaning of the regulation.[1] Examples are merely illustrative and are not controlling where the language is clear and explicit as it is here.

---

[1]To paraphrase an oft-quoted aphorism, a restriction is a restriction is a restriction.

To hold that securities law restrictions are not restrictions within the meaning of the applicable regulations would create a potential for abuse under such regulations. A corporation could issue stock, subject to securities law restrictions significantly affecting its value, as compensation to employees who would only be required to include the value of such stock, as reduced by such restrictions,[8] in their ordinary income. Thus, any appreciation resulting when the corporation later caused such restrictions to be removed (by registration for instance) would only be taxed at capital gains rates upon the subsequent disposition of such stock. In this way, a corporation would give its employees valuable stock as compensation for services but such employees would be required to report only a portion of its value as ordinary income. Accordingly, we hold that the promotional restrictions are "restrictions" having a significant effect on the value of petitioner's stock for purposes of sections 1.61–2(d)(5) and 1.421–6(d)(2)(i), Income Tax Regs.

Having decided that the promotional restrictions are restrictions having a significant effect on the value of petitioner's stock within the meaning of the applicable regulations, we must now decide if such promotional restrictions lapsed in 1968, or if the restrictions on the liquidation, dividend, and voting rights of petitioner's stock no longer had a significant effect on its value after the termination of the escrow. The Order and the Amendment clearly terminated the escrow of petitioner's stock, and we find that the restrictions on liquidation, dividend, and voting rights no longer had a significant effect on the value of petitioner's stock after such termination.

The Commissioner of Corporations intended to terminate all of the promotional restrictions on petitioner's stock by virtue of the Order and the Amendment. Prior to 1969, the Commissioner of Corporations did not enforce promotional restrictions by any means other than the escrow requirement and he never terminated an escrow without also terminating the other

---

[8]Of course, secs. 1.61–2(d)(5) and 1.421–6(d)(2)(i), Income Tax Regs., do not apply to transactions to which sec. 83, I.R.C. 1954, which was added by the Tax Reform Act of 1969, is applicable.

promotional restrictions at the same time. Moreover, the Commissioner of Corporations' position with regard to petitioner's stock is that all the promotional restrictions were terminated, although "inartfully," by the Order and the Amendment and that if asked he would issue an order or amendment to the permit in order to clarify his position on the subject.

The private memorandum relating to the Amendment supports our conclusion that the Commissioner of Corporations intended to terminate all of the promotional restrictions on petitioner's stock. Such memorandum states:

Applicant also seeks an amendment to the permit dated July 25, 1968, to delete the escrow condition, as the analysis of Mr. Mattes [relating to the propriety of removing the restrictions on the liquidation, dividend, and voting rights of the stock] shows applicant's financial condition warrants the removal of the escrow and legend condition.

Such private memorandum also contains a typeover of the letters "a" and "b" making it unclear whether the Amendment recommended therein should delete condition (a) or condition (b) of the July 25, 1968, permit. Such ambiguity plausibly explains why the Commissioner of Corporations' intent to remove all of the promotional restrictions from petitioner's stock was not artfully consummated and why the Order and the Amendment when taken together, terminate the escrow restriction twice.

The July 25, 1968, permit was atypical in that it did not provide for the termination of the restrictions on liquidation, dividend, and voting rights upon the termination of the escrow, but instead required an amendment to the permit. In the typical case, the Order would have terminated *all* of the promotional restrictions, so that an attorney experienced in California corporate securities law would have concluded upon a routine examination of the Commissioner of Corporations' public file relating to petitioner's stock that all promotional restrictions on such stock had been removed. In fact, petitioner's own attorney, who was experienced in California securities law, did conclude, in a letter dated September 1, 1970, that:

4. On August 22, 1968, the Commissioner of Corporations issued his Order Terminating Escrow and his Amendment to Permit dated the same date under the terms of which he removed the shares of common stock from the escrow conditions and released the shares from all of the restrictions and conditions previously imposed thereon.

Assuming arguendo that all of the promotional restrictions

were not effectively terminated by the Order and Amendment, the restrictions which remained upon termination of the escrow clearly did not significantly affect the value of petitioner's stock because the Commissioner of Corporations intended that such restrictions be terminated, he had terminated the escrow which was the only means he ever used to enforce such restrictions, he was of the opinion that the restrictions had been terminated "inartfully," he stood ready to issue an order or amendment to permit clarifying the fact that they were terminated and, attorneys with substantial experience in California securities law would be and were unaware, upon a routine examination of the relevant documents, that such restrictions had not been terminated. Accordingly, we hold that upon the issuance of the Order and the Amendment, all restrictions significantly affecting the value of his stock lapsed so that petitioner realized ordinary income at such time in accordance with sections 1.61–2(d)(5) and 1.421–6(d)(2)(i), Income Tax Regs.

*Decision will be entered for the respondent.*

Reviewed by the Court.