AARON L. KOLOM AND SERITA KOLOM, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5699–76.     November 21, 1978.

*S. Zachary Samuels*, for the petitioners.
*Kenneth G. Gordon*, for the respondent.

SCOTT, *Judge:* Respondent determined a deficiency of $42,489
in petitioners' Federal income tax for the calendar year 1972. By
amendment to answer, respondent claimed an increased defi-
ciency of $1,303, making the total deficiency in issue $43,792. The
increased deficiency resulted from a recomputation of income
subject to the minimum tax based on the mean price of stock
with respect to which options were exercised rather than the
closing price on the New York Stock Exchange. The increased
deficiency is not an issue separate from the issues with respect to
the deficiency as determined in the notice of deficiency.

The issues presented for decision are:

(1) What is the fair market value of stock acquired by
petitioner Aaron L. Kolom pursuant to his exercise of qualified
stock options;

(2) Whether the minimum tax provisions of sections 56 and
57(a)(6), I.R.C. 1954,[1] are unconstitutional as applied to the facts
of this case;

(3) Whether the deficiency was determined as a result of a
second examination of petitioners' records; and

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as
amended and in effect during the year in issue.

(4) Whether respondent should be required to pay petitioners' attorney's fees incurred in connection with this case.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners Aaron L. Kolom and Serita Kolom, husband and wife, resided in Los Angeles, Calif., at the time they filed the petition in this case. They timely filed their Federal income tax return for the calendar year 1972. Petitioners signed their 1972 return on April 5, 1973.

During the year 1972, Aaron L. Kolom (hereinafter petitioner) was an officer and director of Tool Research & Engineering Corp. (hereinafter Tool Research), a corporation duly formed and organized under the laws of the State of Delaware. As of 1972, Tool Research was a corporation registered under section 12, Securities Exchange Act of 1934, 15 U.S.C. sec. 78 l.

On November 6, 1968, Tool Research's Stock Option Committee, pursuant to the employees' stock option plan which met the qualification requirements of section 422, granted petitioner an option to purchase 2,000 shares of $1 par value Tool Research capital stock at an option price of $44 per share. The option continued for a term of 5 years, and was exercisable in whole or in part in installments of 25 percent at the time the option was granted, 25 percent at the end of the first year, 25 percent at the end of the second year, and the final 25 percent at the end of the third year. If petitioner did not exercise the full 25 percent in any one year, his rights the following years were to be cumulative. In accordance with the terms of Tool Research's Employees' Stock Option Plan, the option could not be exercised more than 5 years from the date of the grant thereof. In addition, the option could not be exercised if there were outstanding any qualified stock option granted before the grant of the option of November 6, 1968. On February 23, 1970, petitioner was granted an additional option for the purchase of 5,000 shares of Tool Research stock at an option price of $13.375 per share. On January 29, 1971, petitioner was granted another option for the purchase of 3,000 shares of Tool Research stock at an option price of $20.625 per share. The terms of these latter two options were substantially the same as the terms of the option granted petitioner on November 6, 1968.

In 1972, petitioner exercised certain qualified stock options he had in Tool Research's qualified stock option plan. The dates of the exercise, the numbers of shares received, the mean price of the stock on the New York Stock Exchange on the date of exercise, and petitioner's option price were as follows:[2]

| Date of exercise | Number of shares | Mean price per share on N.Y.S.E. | Option price per share | Total option price |
|---|---|---|---|---|
| 9/15/72 | 6,678 | $52.00 | $13.25 | $88,484 |
| 10/5/72 | 4,174 | 45.25 | 12.00 | 50,088 |
| 10/5/72 | 1,575 | 45.25 | 19.625 | 30,909 |

The stock received by petitioner was registered under Form S(8) of the applicable Securities and Exchange Regulations. The stock could have been resold on the New York Stock Exchange at the price quoted at the time of sale on the date the option was exercised but had it been sold on that date petitioner, as a director and officer of Tool Research, would have been subject to the provisions of section 16(b), Securities Exchange Act of 1934, 15 U.S.C. sec. 78p(b).[3]

On September 15, 1972, when petitioner exercised the first of his options, the closing market price of Tool Research stock on the New York Stock Exchange was 51⅛; upon the expiration of 6 months, the stock closed at 23⅝. On October 5, 1972, when petitioner exercised his remaining options, Tool Research stock closed at 44; 6 months later the stock closed at 20⅜. From March 15, 1972, to September 15, 1972, the lowest price of Tool Research stock on the New York Stock Exchange was 41. The price did not go below 40 during the calendar year 1972. In January 1973, the lowest price to which the stock dropped was 32 and in February, 24. The price at which the stock closed on April

[2]Because of stock splits and stock dividends, the number of shares subject to options was increased and the per share price decreased. The options which were exercised were the three options referred to in the findings.

[3]Under the terms of sec. 16(b), Securities Exchange Act of 1934, the profits realized by an officer or director of a corporation from the sale of an equity security of that corporation within 6 months after its acquisition inure to the benefit of, and are recoverable by, the corporation. Generally, the measurement of the sec. 16(b) liability is the difference between the price at which the shares were acquired and the sales price. Under reg. 16(b)–6, Securities and Exchange Commission, 17 C.F.R. sec. 240.16b–6 (1977), however, when a stock option is exercised more than 6 months after it was granted, the sec. 16(b) liability is subject to a maximum limit, measured by the difference between the sales price and the lowest quoted market price within 6 months before and after the date of exercise of the option.

5, 1973, was the lowest price the stock had reached up to that time during the year 1973.

With his income tax form for 1972, petitioner completed and filed Form 4625, "Computation of Minimum Tax." This form shows tax-preference items totaling $111,398, which consist of accelerated depreciation and capital gains. Petitioner's stock options are not reflected in the minimum tax computation. On the last sheet attached to his tax return, however, petitioner included the following statement:

Statement 9 - Form 4625 Footnotes

During 1972 taxpayer exercised his option to purchase Tool Research Co. stock. The taxpayer is not treating this as preference income for the following reason:

Income Tax Regulation 1.57–1(f)5(i) states that there is no tax preference if the stock is disposed of in the year the option is exercised. By law, taxpayer could not sell the stock in the year the option was exercised because all of his profit would belong to the corporation. The stock is being sold the year in which the taxpayer is first able to sell the stock. Because of the above reason and because the nature of the tax consequences are the same whether the taxpayer sold the stock in the year the option was exercised or the succeeding year, the item is not being treated as a tax preference item in 1972.

Petitioner's return for 1972 was examined and audit changes were made with respect to adjustments other than the minimum tax. Petitioner and respondent agreed to these adjustments in November 1974. Subsequent to petitioner's meeting with the revenue agent regarding his tax liability, petitioner received a letter dated January 15, 1975, from the District Director stating that the revenue agent's report had been reviewed and accepted. Approximately a year later, petitioner received a phone call from a revenue agent who brought up the subject of petitioner's liability for minimum tax in 1972. Petitioner gave the agent no information above and beyond that which had been considered during the course of the audit. As a result of an examination of Tool Research's books and records, in September of 1975, Revenue Agent Lloyd E. Beal submitted a written request for approval to reopen petitioner's 1972 tax liability, a closed examined case. The reasons for the request were a "substantial error" and a "serious administrative omission resulting in criticism, undesirable precedent or inconsistent treatment." The reopening memorandum was approved by Mr. Beal's group supervisor, the chief of the field audit branch, the acting technical coordinator, the acting chief of the audit division, and

the acting district director. The approval to reopen petitioners' examined year was obtained in October 1975 and petitioners were so notified in January 1976.

On petitioners' Federal income tax return for 1973, they showed a minimum tax liability of $8,097 for stock options. This figure was apparently calculated on the basis of the difference between the option price of the stock and the mean prices at which the stock was traded 6 months after the dates of exercise.

In his notice of deficiency, respondent determined the $424,888 difference between the fair market value of the stock at the time of exercise of the options and the option price to be an item of tax preference subject to the minimum tax.

## OPINION

Section 56(a)[4] as applicable to the year 1972 imposed a tax of 10 percent of the amount by which items of tax preference in excess of $30,000 were greater than the sum of the income tax for the year computed without regard to the tax imposed by section 56(a) and certain other sections and reduced by certain specified credits. The items of tax preference to which the minimum tax applies are set forth in section 57. Where stock is transferred pursuant to the exercise of a qualified or restricted stock option, under section 57(a)(6)[5] the amount by which the

---

[4]Sec. 56(a), as effective in 1972, provided:

SEC. 56. IMPOSITION OF TAX.

(a) IN GENERAL.—In addition to the other taxes imposed by this chapter, there is hereby imposed for each taxable year, with respect to the income of every person, a tax equal to 10 percent of the amount (if any) by which—

    (1) the sum of the items of tax preference in excess of $30,000, is greater than

    (2) the sum of—

      (A) the taxes imposed by this chapter for the taxable year (computed without regard to this part and without regard to the taxes imposed by sections 531 and 541) reduced by the sum of the credits allowable under—

        (i) section 33 (relating to foreign tax credit),

        (ii) section 37 (relating to retirement income),

        (iii) section 38 (relating to investment credit),

        (iv) section 40 (relating to expenses of work incentive program), and

        (v) section 41 (relating to contributions to candidates for public office); and

      (B) the tax carryovers to the taxable year.

[5]Sec. 57(a)(6) provides:

SEC. 57. ITEMS OF TAX PREFERENCE.

(a) IN GENERAL.—For purposes of this part, the items of tax preference are—

    \*       \*       \*       \*       \*       \*       \*

    (6) STOCK OPTIONS.—With respect to the transfer of a share of stock pursuant to the exercise of a

fair market value of the stock at the date of exercise of the option exceeds the option price is a tax-preference item.

Respondent contends that the amount of the item of tax preference subject to the minimum tax is, under section 57(a)(6), the mean price of the stock on the New York Stock Exchange on the day of the exercise of each option less the amount paid for, i.e., the option price of, the stock.

Petitioners argue that the fair market value of the stock Mr. Kolom received upon the exercise of his options does not exceed the option price and, therefore, he had no item of tax preference. Petitioners' argument is that had Mr. Kolom sold the stock on the day he exercised the option or within 6 months thereafter, his profit would have inured to the benefit of the corporation under section 16(b), Securities Exchange Act of 1934, and for this reason the option price of the stock constitutes its fair market value. Petitioners argue that, if section 57(a)(6) is not construed as they contend, it is unconstitutional.

In support of his position that the fair market value of the stock is its mean listed price on the New York Stock Exchange on the dates the options were exercised, respondent relies on section 1.57–1(f)(2)–(3),[6] Income Tax Regs. At the time of the trial in this case, the regulations with respect to the minimum tax were in proposed form. They have since been adopted, T.D. 7564, 43 Fed. Reg. 40459 (Sept. 12, 1978). While there are some differences in language in the proposed and final regulations, the substance of the provisions with respect to the applicability of the minimum tax to the exercise of qualified or restricted

qualified stock option (as defined in section 422(b)) or a restricted stock option (as defined in section 424(b)), the amount by which the fair market value of the share at the time of exercise exceeds the option price.

[6]Sec. 1.57–1(f)(2)–3, Income Tax Regs., provides:

(f) *Stock options.* * * *

(2) *Definitions.* See generally sec. 1.421–7(e), (f), and (g) for the definitions of "option price," "exercise," and "transfer," respectively; however, in the case of a transfer of a share of stock pursuant to the exercise of a qualified stock option or a restricted stock option after the death of an employee by the estate of the decedent (or by a person who acquired the right to exercise such option by bequest or inheritance or by reason of the death of the decedent), the term "option price" shall, for purposes of this paragraph, include both the consideration paid by the estate (or such person) for such share of stock and so much of the basis of the option as is attributable to such share of stock. * * *

(3) *Fair market value.* In accordance with the principles of section 83(a)(1), the fair market value of a share of stock received pursuant to the exercise of a qualified or restricted stock option is to be determined without regard to restrictions (other than nonlapse restrictions within the meaning of sec. 1.83–3(h)). Notwithstanding any valuation date given in section 83(a)(1), for purposes of this section, fair market value is determined as of the date the option is exercised.

stock options is the same. Section 1.57–1(f)(3), Income Tax Regs., provides that the fair market value of stock received upon the exercise of a qualified stock option is to be determined in accordance with the principles of section 83(a)(1) without regard to restrictions other than nonlapse restrictions within the meaning of section 1.83–3(h), Income Tax Regs. Petitioners contend that section 1.57–1(f)(3), Income Tax Regs., is invalid. They base this contention primarily on the ground that this regulation is contrary to section 83(e)(1), which provides that section 83 is inapplicable to section 421 transfers. The regulations do not provide for inclusion in a taxpayer's taxable income of the value of the stock received upon exercise of a qualified stock option. Rather, the regulations apply the valuation principles of section 83 in determining the fair market value of stock received by a taxpayer upon exercise of a qualified stock option. Therefore, we see no merit in petitioners' assertion that section 1.57–1(f)(3), Income Tax Regs., is invalid because of an inconsistency with section 83(e)(1). The balance of petitioners' argument as to the invalidity of section 1.57–1(f)(3), Income Tax Regs., deals primarily with the applicability of certain of the provisions of section 83(a)(1) and section 1.83–3(h), Income Tax Regs., to this case, rather than with the validity of the regulations.

Section 83(a) generally provides that when property is transferred to a taxpayer in connection with the performance of services, the value of the property at the first time the rights of the taxpayer in the property are transferable or not subject to a substantial risk of forfeiture, less the amount paid for the property, is includable in the taxpayer's gross income. Under section 83(a)(1),[7] the value of the property is to be determined without regard to restrictions other than those which, by their terms, will never lapse. Section 1.83–3(h),[8] Income Tax Regs.,

---

[7]SEC. 83. PROPERTY TRANSFERRED IN CONNECTION WITH PERFORMANCE OF SERVICES.

(a) GENERAL RULE.—If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of —

(1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, * * *

[8]Sec. 1.83–3(h), Income Tax Regs., provides:

(h) *Nonlapse restriction.* For purposes of section 83 and the regulations thereunder, a restriction

provides that a "nonlapse restriction" is a permanent limitation on the transferability of property which applies to the transferee or any subsequent holder. This regulation states that limitations imposed by registration requirements of State or Federal securities laws or similar laws imposed with respect to sales or other dispositions of stock or securities are not nonlapse restrictions. Respondent contends that section 16(b) of the Securities Exchange Act of 1934 is not a "nonlapse restriction" within the meaning of section 1.83–3(h), Income Tax Regs. Petitioners contend that section 16(b), Securities Exchange Act of 1934, is not a registration requirement or a similar law and conclude that the regulations are for this reason invalid as applied to this case. While petitioners' argument, if accepted, would go to the applicability of the regulations to this case, it does not go to the validity of the regulations.

If section 16(b), Securities Exchange Act of 1934, is a "restriction" as that term is used in section 83(a)(1) and section 1.83–3(h), Income Tax Regs., it clearly is not a "nonlapse restriction" within the meaning of those regulations since under section 16(b), Securities Exchange Act of 1934, the requirement of payment to the corporation of profits upon sale of the stock expires 6 months after exercise of the stock option.

While not specifically so stated, petitioners apparently contend that respondent's regulations as applied to this case are invalid since they change preexisting law as to the determination of the fair market value of stock received upon the exercise of qualified stock options by a taxpayer subject to the provisions of section 16(b), Securities Exchange Act of 1934. In our view, for reasons hereinafter stated, without reference to section 1.57–1(f)(2)–(3), Income Tax Regs., the law is that the fair market

---

which by its terms will never lapse (also referred to as a "nonlapse restriction") is a permanent limitation on the transferability of property—

(i) Which will require the transferee of the property to sell, or offer to sell, such property at a price determined under a formula, and

(ii) Which will continue to apply to and be enforced against the transferee or any subsequent holder (other than the transferor).

A limitation subjecting the property to a permanent right of first refusal in a particular person at a price determined under a formula is a permanent nonlapse restriction. Limitations imposed by registration requirements of State or Federal security laws or similar laws imposed with respect to sales or other dispositions of stock or securities are not nonlapse restrictions. An obligation to resell or to offer to sell property transferred in connection with the performance of services to a specific person or persons at its fair market value at the time of such sale is not a nonlapse restriction. See sec. 1.83–5(c) for examples of nonlapse restrictions.

value of stock received by a taxpayer subject to section 16(b), Securities Exchange Act, is its selling price on the New York Stock Exchange when it is received. Therefore, section 1.57–1(f)(2)–(3), Income Tax Regs., if applicable, is not invalid as applied to this case. We express no opinion as to whether this regulation would be valid in a situation in which it changed the criteria for determining the fair market value of stock from that under existing law.

The provisions of section 57(a)(6) refer to "the fair market value" of the stock which is the subject of the exercise of the qualified stock option at the date of the exercise of the option. When Congress enacted this section, the term "fair market value" had long had a clearly defined meaning. *United States v. Cartwright,* 411 U.S. 546, 551 (1973).

Generally, where stock is traded on a national exchange, the fair market value of relatively small quantities of the stock on any date on which the stock is traded on that exchange is the price at which the stock is sold. *United States v. Cartwright, supra; Freshman v. Commissioner,* 33 B.T.A. 394, 402–403 (1935). The obvious reason for using the exchange price as the fair market value of the stock is that this price is the best evidence of what a willing buyer will pay a willing seller for the stock. However, there are many exceptions to the use of the quoted exchange prices as indicative of the value of stock. These cases all involve unusual circumstances such as a restriction on sale of the stock or a large block of stock being valued. *Frizzelle Farms, Inc. v. Commissioner,* 61 T.C. 737, 743 (1974), affd. 511 F.2d 1009 (4th Cir. 1975).

Applying the ordinary rules of determining the fair market value of the number of shares of stock involved in each transaction in this case, the mean price at which the stock sold on the New York Stock Exchange on the date of the transaction would be the fair market value of the stock. If the stock had actually been sold, petitioners recognize that the New York Stock Exchange price would have been the price which would have been received for the stock. Petitioners nevertheless contend that under the facts of this case that amount is not the "fair market value" of the stock within the meaning of section 57(a)(6).

Both parties agree that fair market value is "the price at which property would change hands in a transaction between a

willing buyer and a willing seller, neither being under compulsion to buy nor to sell and both being informed." *United States v. Cartwright, supra; Hamm v. Commissioner,* 325 F.2d 934, 937 (8th Cir. 1963), affg. a Memorandum Opinion of this Cou.·t. Petitioners argue that in this case one of the necessary elements, a willing seller, is missing. This argument is not new. We have consistently held that the definition is not a personalized one which envisions a particular seller and a particular buyer. Rather, the definition refers to hypothetical parties. As we said in *Estate of Reynolds v. Commissioner,* 55 T.C. 172 (1970):

"Fair market value" is not an incantation whose ritualistic use will immediately reveal the worth of unusual types of property. The basis of the definition of fair market value is the assumption that hypothetical willing buyer and hypothetical willing seller, neither being under compulsion to buy or sell and both having reasonable knowledge of the relevant facts, will arrive at some sale price for the property in question. * * * In reality, no willing buyers or willing sellers may exist. * * * [55 T.C. at 195.]

Petitioners argue that even though as a general rule the willing buyer and willing seller may be hypothetical, under the circumstances of this case the price to the seller at which the property would change hands in any sale transaction is the option price, because this is the amount that Mr. Kolom would be permitted to retain, after paying his liability under section 16(b), Securities Exchange Act of 1934.[9] They cite *Anderson v. Commissioner,* 480 F.2d 1304 (7th Cir. 1973), revg. 56 T.C. 1370 (1971); *Cummings v. Commissioner,* 506 F.2d 449 (2d Cir. 1974), revg. 61 T.C. 1 (1973); and *Kimbell v. United States,* 490 F.2d 203 (5th Cir. 1974), for the proposition that section 16(b) payments

---

[9]Petitioner may have been able to retain part of the profits upon sale since it appears that reg. 16b–6, Securities and Exchange Commission, 17 C.F.R. sec. 240.16b–6 (1977), is applicable. This regulation provides:

Sec. 240.16b–6 Exemption of long term profits incident to sales within six months of the exercise of an option.

(a) To the extent specified in paragraph (b) of this section the Commission hereby exempts as not comprehended within the purposes of section 16(b) of the act any transaction or transactions involving the purchase and sale or sale and purchase of any equity security where such purchase is pursuant to the exercise of an option or similar right either (1) acquired more than six months before its exercise, or (2) acquired pursuant to the terms of an employment contract entered into more than six months before its exercise.

(b) In respect of transactions specified in paragraph (a) of this section the profits inuring to the issuer shall not exceed the difference between the proceeds of sale and the lowest market price of any security of the same class within six months before or after the date of sale. Nothing in this section shall be.deemed to enlarge the amount of profit which would inure to the issuer in the absence of this section.

are properly characterized as adjustments to the purchase price of stock and that the sales price or market price should be reduced by the amount of any potential section 16(b) liability. *Kimbell v. United States, supra,* did not involve the sale of "insider" stock although cases involving this issue were discussed therein (490 F.2d at 205). At issue in each of the other two cases was whether section 16(b) repayments to a corporation by an insider who had sold stock should be characterized as ordinary and necessary business expenses or as capital losses. In these cases, it was held that the *Arrowsmith*[10] doctrine applied and the section 16(b) repayments constituted capital losses. It is true that in these cases the courts characterize the section 16(b) repayments as effectively being adjustments to the sales price of the stock sold. However, this characterization was for the purposes of showing the application of the *Arrowsmith* doctrine and the relationship between the sales transaction and the payment of the section 16(b) liability. In our view these cases do not hold, as petitioners argue, that the fair market value of the stock is to be reduced by the potential section 16(b) liability. Demonstrative of this fact is that in *Cummings v. Commissioner, supra,* the sale resulting in the capital gain was in the year preceding the 16(b) repayment. No adjustment was made to the gain in the prior year. The repayment in the subsequent year was considered a capital loss in the year in which made even though because of other capital losses it resulted in no tax benefit in that year to the taxpayer. In our view the cases dealing with the treatment of section 16(b) repayments are not helpful in resolving the issue presented in this case of the fair market values of the stock when the options were exercised.

Petitioners strongly rely on *MacDonald v. Commissioner,* 230 F.2d 534 (7th Cir. 1956), affg. in part and revg. in part 23 T.C. 227 (1954). In *MacDonald,* to induce a taxpayer to accept employment, a corporation granted him stock options exercisable at less than the stock's market value. This Court held that upon exercise of the options, the bargain element—the spread between the option price of the stock and its fair market value—was compensatory in nature and therefore includable in the taxpayer's gross income. This conclusion was sustained on

---

[10]*Arrowsmith v. Commissioner,* 344 U.S. 6 (1952).

appeal. This Court, however, had also held that the measure of the fair market value of the stock was its selling price on the New York Stock Exchange. In so concluding we did not recognize as binding an oral agreement restricting the sale of the stock. The Court of Appeals for the Seventh Circuit reversed this issue on the ground that a restrictive agreement between the taxpayer and the corporation prohibiting sale of the stock during the course of the taxpayer's employment did exist and affected the stock's fair market value. After reaching this conclusion the Court further stated:

We think that for our present purpose we are not required to decide whether Sec. 16(b) is applicable. The many cases cited in U.S.C.A. following the section disclose that it has been a fruitful source of litigation and that it has been given a liberal interpretation. * * *

*         *         *         *         *         *         *

It is true that the section does not preclude the sale of stock. As stated in Consolidated Engineering Corp. v. Nesbit, D.C., 102 F.Supp. 112,114:

"It will be noted from the above that Section 78p does not make the purchase and sale of stock unlawful or irregular. It provides only that the profits, if any, shall be recovered by the corporation."

The statute, however, does make the seller liable for profits realized from such sale. * * *

*         *         *         *         *         *         *

Even though we find it unnecessary to decide the question, we are strongly inclined to the view that the statute is applicable and that if the taxpayer had sold the stock during the six-month period following its acquisition, he would have been liable to account to the corporation for all profits. And it can be said to a certainty that if he had done so he would have laid himself open to an action for the recovery of such profits, with the probability that he could not have defended successfully. * * *

* * * Taxpayer acquired the corporate stock with an agreement not to sell and, in addition, if he had violated this agreement and sold the stock, he probably would have been required to account for the profits. Certainly he would have been faced with a legal action to recover such profits. This is not to say that he did not realize economic gain upon purchase of the stock but, even so, the question remains as to the proper formula for the ascertainment of the amount and extent of such gain. The Tax Court has held that it is the difference between the option price and the fair market value of the stock on the New York Stock Exchange at the time of its acquirement. We disagree with that conclusion. * * *

The testimony of these expert witnesses clearly shows that neither the taxpayer nor any other person under similar circumstances would be a willing seller, with knowledge that all profits realized might inure to the benefit of the corporation, and it is doubtful if any person cognizant of the circumstances would become a willing buyer. [230 F.2d 540–541]

It is to be noted that the *MacDonald* case involved stock options granted to the taxpayer as compensation. The statements of the Circuit Court of Appeals as to the applicability of section 16(b), of the Securities Exchange Act, were dicta. However, the statements themselves show that the Circuit Court did not contemplate that because of the provisions of section 16(b), Securities Exchange Act, the option price represented fair market value.[11]

In *Husted v. Commissioner*, 47 T.C. 664, 679 (1967), we held stock acquired by the taxpayer for less than its fair market value represented additional compensation. The taxpayer had paid $1 a share for most of the stock and $3 a share for the remainder. Although small quantities of this stock had been sold near the valuation date at $11 a share, we concluded that the fair market value of the stock on the date of its acquisition was $7. In reaching this conclusion we stated at page 679:[12]

We have examined all the circumstances surrounding Husted's stock holding. Although the investment letter, as a practical matter, prevented Husted from selling the stock publicly for some period of time, it did not prevent him from selling the stock privately. *Victorson v. Commissioner*, 326 F.2d 264 (C.A. 2, 1964), affirming a Memorandum Opinion of this Court; *Jack I. LeVant*, 45 T.C. 185 (1965), on appeal (C.A. 7, May 18, 1966). Thus, Husted's situation differed from that in the case of *Harold H. Kuchman*, 18 T.C. 154 (1952), acq. 1952-2 C.B. 2. Because of his position with Dorsey, section 16(b) of the Securities and Exchange Act of 1934 (48 Stat. 881, 896) might apply to any

---

[11]After the remand in *MacDonald v. Commissioner*, 230 F.2d 534 (7th Cir. 1956), affg. in part and revg. in part 23 T.C. 227 (1954), respondent moved for a further hearing pursuant to the mandate of the Court of Appeals and proposed alternative methods of computing the gain realized by the taxpayer. Unable to find any meritorious method of computation other than that used in the original opinion, i.e., the difference between the option price and the market price of the stock as traded on the New York Stock Exchange, this Court denied respondent's motion. *MacDonald v. Commissioner*, a Memorandum Sur Order dated Oct. 18, 1956. An appeal was taken from our decision of no deficiency thereafter entered. This decision of no deficiency was reversed and the case was remanded by the United States Court of Appeals for the Seventh Circuit with instructions to hear additional evidence. *Commissioner v. MacDonald*, 248 F.2d 552 (7th Cir. 1957).

[12]In *Burns v. Commissioner*, T.C. Memo. 1974–220, we stated, as follows, with respect to *Husted v. Commissioner*, 47 T.C. 664, 679 (1967):

Although no restrictions were noted on the face of the certificate received by the taxpayer in *Husted*, as is also true of the immediate case, disposition of the stock was significantly restricted by the following factors not found here: (1) the taxpayer executed an "investment letter" for each block of shares in which he warranted to Dorsey that he was acquiring the stock for investment and "without any intention of selling or distributing the same"; (2) the 4,200 shares were subject to a repurchase agreement in favor of Dorsey in the event the acquisition was not completed; (3) taxpayer's stock represented a significant portion of the outstanding stock of Dorsey and exceeded the amount of Dorsey stock sold on the exchange in each of the six months following the acquisition; and (4) there was a possibility that the taxpayer's resale of the stock within six months of receipt could have violated section 16(b) of the Securities and Exchange Act of 1934.

sale of the stock which he would make within 6 months of its acquisition. [Footnote omitted.] Although there is some legal uncertainty as to the applicability of section 16(b) in this situation, it is enough for us to recognize that the possibility of its applying constituted a deterrent to the sale of the stock within 6 months. Husted's holding of 34,200 shares represented a significant portion of the outstanding stock and exceeded the amount of stock sold on the exchange in April or in any of the other 6 succeeding months. However, we know that 150,000 shares were sold through the underwriting in the last part of April and the first part of May; and though there would no doubt be some difficulty in finding a placement for another 34,000 shares, we are inclined to think that it would not have been impossible. * * *

In the *Husted* case, as above stated, we determined that the fair market value of the large block of restricted stock was $7 a share, greatly in excess of the price the taxpayer paid for the stock on the date the stock was acquired.

In arguing that the value of stock held by an insider is limited to the price paid for the stock because of a potential section 16(b) liability, petitioners quote out of context language from *Bayley v. Commissioner*, 69 T.C. 234 (1977), a Court-reviewed case. The full statement from which that language is extracted is—

We do not believe that Rev. Rul. 68–286 is contrary to our decision in *Hirsch* since we believe it was based on the premise that section 16(b) restrictions do not "significantly" affect value rather than that the section 16(b) restrictions are not "restrictions" within the meaning of the applicable regulations. A buyer (unless he, too, is an "insider") will take an "insider's" stock free from the restrictions of section 16(b) *so that such restrictions do not affect the value of such stock in the eyes of the purchaser. The value of such stock to the selling "insider" will be reduced, not because its market value is reduced, but only because he must return any "insider profit" to his company.* * * * [69 T.C. at 244; emphasis added.]

This language does not lend support to petitioners' argument but rather recognizes that section 16(b) does not affect market value, even though it might affect the value to the insider of the stock held by the insider.

Petitioners' argument that the "fair market value" of the stock Mr. Kolom received on the exercise of his stock options as of the date the options were exercised was the option price is tantamount to an argument that sections 56 and 57(a)(6) do not apply to a person subject to the provisions of section 16(b), Securities Exchange Act.[13] Since many participants in qualified

[13]The legislative history is clear that the tax imposed by sec. 56 was intended to require the payment of some tax on "economic income" which under the tax laws was not "taxable income."

stock option plans are "insiders" subject to section 16(b) of the Securities Exchange Act, had Congress intended so drastic a limitation of the application of the sections, in our view the statute would have so stated.

Since in our view Congress did intend sections 56 and 57(a)(6) to apply to persons subject to the provisions of section 16(b), Securities Exchange Act, we do not accept petitioners' argument that the fair market value of the stock for which Mr. Kolom exercised his stock options in 1972 at the date of the exercise of those options was the option price of the stock.

Petitioners on brief argue that even if their primary argument is not accepted, some adjustment to the value of their stock must be made because of the provisions of section 16(b), Securities Exchange Act. Petitioners suggest that we should use the market price of the stock on the date 6 months following Mr. Kolom's purchase of the stock. There is no support for this position in the statute.[14] Section 57(a)(6) refers to fair market value at the date the option is exercised. There is nothing in this record to show that section 16(b) was a restriction which had a significant effect on the value of the stock Mr. Kolom received when he exercised his option under our holding of what constitutes "fair market value" in *Bayley v. Commissioner, supra.*

In our view, if we adhere to our holding in the *Bayley* case we must conclude here that since section 16(b) does not affect the value of the stock in the eyes of the purchaser no adjustment is required to the quoted price of the stock on the dates on which Mr. Kolom exercised his options because of the provisions of section 16(b), Securities Exchange Act.

We therefore hold that respondent properly computed the fair market value of the stocks here involved by use of the mean

---

However, there is no discussion specifically of the intent of sec. 57(a)(6) which was added to the House bill by the Senate. See H. Rept. 91–413 (1969), 1969–3 C.B. 200, 249; S. Rept. 91–552 (1969), 1969–3 C.B. 423, 495; Conf. Rept. 91–782 (1969), 1969–3 C.B. 644, 658–659.

[14]It should be noted that at the time the option is exercised there is no way to determine whether the market price of the stock on the stock exchange will increase or decrease in the ensuing 6 months. All that can be known at that time is the value at dates prior to the exercise of the option. This leaves as speculative whether an "insider" subject to the provisions of sec. 16(b), Securities Exchange Act, who has held his option for over 6 months at the time it is exercised would, even if he sold the stock within 6 months, be liable to return to the corporation any amount in excess of the price he received and the lowest price of the stock in the 6 months prior to the date of the exercise of the option. (See nn. 3 & 9 *supra.*)

prices at which those stocks sold on the New York Stock Exchange on the dates Mr. Kolom exercised his options.

Petitioners' second argument is that the minimum tax provisions of sections 56(a) and 57(a)(6) are unconstitutionally confiscatory as applied to the exercise of a qualified stock option by a person subject to section 16(b), Securities Exchange Act of 1934.

The thrust of petitioners' argument in this regard is that a market decline during the 6-month period following exercise of the option could eliminate any profit Mr. Kolom could have realized upon the sale of the stock acquired upon exercise of the option. Accordingly, his argument continues, the minimum tax may be imposed in the absence of any realized gain. The flaw in this argument is that a gain is realized upon exercise of the option itself. At that time, petitioner acquired property the value of which substantially exceeded the price paid for the property. Were a gain not realized at this time, the nonrecognition provisions of sections 421 and 422 would be superfluous. See *Commissioner v. LoBue,* 351 U.S. 243 (1956); *Commissioner v. Smith,* 324 U.S. 177 (1945). It is true that within the 6-month period following exercise of the options, petitioner may not be able to reduce his realized gain to cash without disgorging part or all of the profit to the corporation. It is also true that a decline in market value during the 6-month period in which the provisions of section 16(b), Securities Exchange Act of 1934, are applicable could eliminate any gain on the sale of the stock during that period. That risk, however, is one that petitioner assumed when he chose to exercise the stock options. It does not follow, however, that merely because petitioner could not reduce his gain to cash for 6 months without incurring a section 16(b) liability, he had no gain. In fact, he had the very type of "economic income," which because of the provisions of sections 421 and 422 is not "taxable income," to which sections 56 and 57 are directed. See n. 13 *supra.* Had petitioner sold his stock in 1972, and in 1973 been required by section 16(b), Securities Exchange Act, to pay over all or part of his profit to the corporation, he would have had a gain on the sale in 1972 and an expense deduction or loss from the payment in 1973. *Cummings v. Commissioner, supra.*

Petitioner's final argument is that he was subjected to a

prohibited second examination in contravention of section 7605(b).[15] There was no prohibited second examination in this case. The examination resulting in the deficiency in petitioners' minimum tax involved no examination of petitioners' books and records. Rather, it occurred after an examination of Tool Research's books and records. It was made with approval of the auditing employee's supervisors and involved only a telephone conversation with petitioner. Also, petitioner was notified of the reopening of his taxable year 1972. With regard to the purposes underlying the enactment of section 7605(b), this Court said in *Collins v. Commissioner*, 61 T.C. 693, 698–699 (1974):

It is evident from the legislative history of section 7605(b) that Congress intended that provision to prevent the Internal Revenue Service from undertaking repetitive investigations as a method of taxpayer harrassment. There is no indication that it was enacted to restrict the scope of the Commissioner's legitimate power to protect the revenue. * * *

We hold that there was no prohibited second examination of petitioners' books and records under section 7605.

As we held in *Key Buick Co. v. Commissioner*, 68 T.C. 178 (1977), this Court is without jurisdiction to award attorney's fees to petitioners.

*Decision will be entered for the respondent.*

Reviewed by the Court.

HALL, *J.:* I concur in the result.

A share of stock awarded as compensation to a person who is subject to a legal requirement that he must disgorge any gains on a sale thereof within 6 months obviously provides significantly less compensation to him than would an otherwise identical share awarded to a person not so subject. Such differences in value may be ignored under section 83 for transactions within its scope, but section 83(e)(1) forbids respondent from applying section 83 to transactions, such as this, covered under section

---

[15]SEC. 7605. TIME AND PLACE OF EXAMINATION.

(b) RESTRICTIONS ON EXAMINATION OF TAXPAYER.—No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional inspection is necessary.

421. Hence section 1.57–1(f)(3), Income Tax Regs., overreaches in defying this prohibition. It cannot be reconciled with the statute and, in my view, is invalid. Section 57(a)(6) defines as the tax preference the excess of "fair market value" over the option price. The statute nowhere authorizes respondent to use, as he does, a figure clearly in excess of fair market value. On the other hand, petitioner is clearly wrong in arguing that either his option price, or the price 6 months later, was fair market value. Since he failed to show the true fair market value of the restricted shares, and there is no evidence in the record to show it, we have no choice but to sustain respondent.

DRENNEN, J., agrees with this concurring opinion.